JOHN D. GRAY AND ELIZABETH N. GRAY, ET AL.,[1] PETITIONERS *v.*
COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Dockets Nos. 2376–68—2381–68.   Filed August 11, 1971.

[1] Cases of the following petitioners are consolidated herewith: John R. Gray, First National Bank of Oregon, guardian, docket No. 2377–68; Joan E. Gray, First National Bank of Oregon, guardian, docket No. 2378–68; Janet L. Gray, First National Bank of Oregon, guardian, docket No. 2379–68; Laurie J. Gray, First National Bank of Oregon, guardian, docket No. 2380–68; and Anne L. Gray, First National Bank of Oregon, guardian, docket No. 2381–68.

*Michael Waris, Jr., Donald Baker, Robert H. Aland,* and *Donald J. Griswold,* for the petitioners.

*John D. Picco* and *Joseph M. Wetzel,* for the respondent.

STERRETT, *Judge:* The respondent in his statutory notices determined deficiencies in the Federal income taxes of the petitioners in amounts and for taxable years as follows:

| Docket No. | 1960 | 1961 | 1962 |
|---|---|---|---|
| 2376-68 | $2,154,786.16 | $13,958.58 | $1,078,428.30 |
| 2377-68 | 164,328.41 | | 53,471.28 |
| 2378-68 | 164,329.32 | | 53,472.17 |
| 2379-68 | 164,329.32 | | 53,472.17 |
| 2380-68 | 164,328.41 | | 56,130.54 |
| 2381-68 | 164,329.32 | | 53,472.17 |

At trial the respondent sought leave of the Court to amend his answers in order to conform the pleadings to the proof with respect to the deficiencies in issue. Said amendment was necessitated by the stipulation of the parties concerning the value of certain preferred stock. The petitioners raised no objection to the requested amendments, hence, leave was granted. Therefore the deficiencies in issue for 1962 are as follows:

| Docket No. | Deficiency | Docket No. | Deficiency |
|---|---|---|---|
| 2376-68 | $1,472,755.80 | 2379-68 | $88,048.67 |
| 2377-68 | 88,047.78 | 2380-68 | 90,707.04 |
| 2378-68 | 88,048.67 | 2381-68 | 88,048.67 |

Due to concessions of the parties these cases present for our determination the following five questions: (1) whether, as the respondent contends, the fair market value of certain business assets transferred by a corporation, wholly owned by the petitioners, was in excess of the consideration received therefor; (2) if such excess did exist, whether the disproportion in value constituted a constructive dividend to the petitioners; (3) whether, as the respondent contends, there was a constructive dividend to the petitioners by reason of their use of the assets of a corporation owned by them in order to aid in the purported sale of said corporation's stock, and if so, whether the petitioners were the owners of certain preferred stock held as an asset of said corporation on the date said stock was redeemed; (4) should question (3) be decided for the petitioners the respondent raises the alternative

contention that aforementioned stock was section 306 [2] stock which upon sale resulted in ordinary income; and (5) whether John D. and Elizabeth N. Gray understated their gross income for the taxable year 1960 by more than 25 percent so that the 6-year statute of limitations of section 6501(e) is applicable.

### FINDINGS OF FACT

Some of the facts were stipulated. The stipulations and the exhibits attached thereto are incorporated herein by this reference.

Petitioners John D. Gray and Elizabeth N. Gray, husband and wife, resided in Portland, Oreg., at the time their petition was filed herein. They filed joint Federal income tax returns for the taxable years 1960, 1961, and 1962 with the district director of internal revenue at Portland, Oreg.

Petitioners John R. Gray, Joan E. Gray, Janet L. Gray, Laurie J. Gray, and Anne L. Gray are the children of petitioners John D. and Elizabeth N. Gray and resided with their parents in Portland, Oreg., at the time their petitions were filed herein. These petitioners, all minors at the time, filed individual Federal income tax returns for 1962 with the district director of internal revenue at Portland, Oreg. They did not file Federal income tax returns for 1960, the only other year involved in their cases.

Petitioners John D. and Elizabeth N. Gray filed their joint Federal income tax return for 1960 on or before April 15, 1961. The amount of gross income stated on said return was $546,794.50. Petitioners and respondent on October 31, 1966, and November 2, 1966, respectively, executed a waiver agreement pursuant to section 6501(c)(4), extending the period for assessment to December 31, 1967. On December 14, 1967, petitioners and respondent executed a further agreement extending the period to February 29, 1968. The statutory notice for the taxable year 1960 was mailed to the petitioners on February 27, 1968.

In 1947, after having spent 5½ years in the U.S. Army, John D. Gray (hereinafter referred to as Gray) received a master of business administration degree with distinction from Harvard University. In 1947 Gray was employed by the Pointer-Willamette Co., Portland, Oreg., as assistant to its president. He occupied this position until 1948, at which time he was employed by Oregon Saw Chain Mfg. Corp., Portland, Oreg., as assistant general manager. The stock of Oregon Saw Chain Mfg. Corp. was owned by Spencer Hinsdale and Joseph B. Cox (hereinafter referred to as Cox), both of Portland, Oreg. Oregon

---

[2] All references by section are to the Internal Revenue Code of 1954 unless otherwise indicated.

Saw Chain Mfg. Corp. was engaged in manufacturing and selling saw chain and related products used in harvesting timber. In September 1950 Spencer Hinsdale's stock in Oregon Saw Chain Mfg. Corp. was purchased by Cox. Thereafter, the name of Oregon Saw Chain Mfg. Corp. was changed to Oregon Saw Chain Corp. In September 1950 Gray became Oregon Saw Chain Corp.'s assistant general manager and served in that position until 1953.

When Oregon Saw Chain Mfg. Corp. began operations in 1947, its manufacturing facilities were located in the basement of the Portland home of Cox. When Gray became employed by Oregon Saw Chain Mfg. Corp. in 1948, its manufacturing facilities had been moved to a garage in Portland, Oreg. In 1950 its manufacturing facilities were removed to a new plant in Portland, Oreg. While Oregon Saw Chain Corp.'s operations were small when Gray first became employed by it, he soon recognized that the corporation had great potential for future expansion and development.

On December 22, 1952, Cox purchased the assets of Planerchain Saws Ltd., a Canadian corporation engaged in manufacturing and selling saw chain and related products used in harvesting timber in Guelph, Ontario, Canada. On February 17, 1953, Cox organized Oregon Saw Chain Ltd. under the laws of the Dominion of Canada, transferring $300 to the corporation for 3 shares of its common stock with a par value of $100 per share. On March 4, 1953, Cox sold the assets previously purchased from Planerchain Saws Ltd. to Oregon Saw Chain Ltd. for a total purchase price of $39,463.94. The purchase price paid by Oregon Saw Chain Ltd. consists in part of the issuance to Cox of the remaining 47 shares of its common stock.

On November 17, 1953, Cox sold his 50 shares of Oregon Saw Chain Ltd. to Gray for a purchase price of $5,000. On the same day Gray was elected president of the corporation.

On November 20, 1953, Oregon Saw Chain Corp., Oregon Saw Chain Ltd., and Gray entered into an agreement whereby Oregon Saw Chain Corp. sold and assigned to Oregon Saw Chain Ltd. certain Canadian patents and patents applications (described *infra*) concerning saw chains, file holders, and related maintenance and service tools for a royalty equal to (a) 5 percent of Oregon Saw Chain Ltd.'s gross sales for a 10-year period commencing December 1, 1953, and ending November 30, 1963, plus (b) 5 percent of any royalties received during said period by Oregon Saw Chain Ltd. from its own sublicensing.

On November 18, 1953, Gray organized Oregon Chain Corp. under the laws of the State of Oregon, transferring $10,000 in cash to the corporation in return for all of its capital stock, which consisted of 100 shares of common. On the same day Gray was elected president and

chairman of the board of Oregon Chain Corp. On November 23, 1953, Oregon Chain Corp., Oregon Saw Chain Corp., Gray, David S. Pattullo, and Paul A. Lewis (the latter two individuals being owners of one share of stock each of Oregon Chain Corp. as nominees for Gray) entered into an agreement whereby Oregon Saw Chain Corp. sold and assigned to Oregon Chain Corp. all of its operating assets (with certain enumerated assets excepted including the November 20, 1953, sales agreement) including its tangible and intangible assets, for a purchase price composed of (a) the assumption by Oregon Chain Corp. of Oregon Saw Chain Corp.'s liabilities; (b) a cash payment equal to the excess of the book value of Oregon Saw Chain Corp.'s assets (exclusive of the retained assets) over its liabilities; (c) a cash payment of $65,000 for goodwill; and (d) a royalty equal to 15 percent of Oregon Chain Corp.'s gross sales and income from sublicensing for the period from December 1, 1953, through November 30, 1958, and a royalty equal to 10 percent of its gross sales and income from sublicensing for the period from December 1, 1958, through November 30, 1963.

On December 2, 1953, Cox caused Oregon Saw Chain Corp. to be liquidated and dissolved under the laws of the State of Oregon. Among other assets received, Cox received the two agreements dated November 20, 1953, and November 23, 1953, in the liquidation of Oregon Saw Chain Corp., thus succeeding to the latter corporation's rights to the payments due under those contracts.

Gray utilized separate, directly owned United States and Canadian corporations to operate the Cox businesses, continuing the same direct form of ownership that had been utilized by Cox. The paid-in capital of Oregon Chain Corp. was $10,000 and it had a substantial and continuing royalty obligation to Cox.

On December 14, 1953, Oregon Chain Corp. changed its name to Oregon Saw Chain Corp., which on July 2, 1957, changed its name to Omark Industries, Inc., its present name. On July 2, 1959, Oregon Saw Chain Ltd. changed its name to Omark Industries (1959) Ltd. Omark Industries, Inc., and Omark Industries (1959) Ltd. and their respective predecessors will hereinafter be referred to as Omark and Omark 1959, respectively.

In January 1954 Gray transferred by gift 5 shares of his Omark stock to each of his three children, Anne L. Gray, Joan E. Gray, and Janet L. Gray, and 10 shares to his wife, Elizabeth N. Gray. Furthermore, Gray transferred 5 shares to each of two other children, John R. Gray and Laurie J. Gray, in January 1955 and April 1957, respectively. After all of these transfers, the stock of Omark was owned as follows:

| Stockholder | Number of shares | Percentage ownership |
|---|---|---|
| John D. Gray | 65 | 65 |
| Elizabeth N. Gray | 10 | 10 |
| Anne L. Gray | 5 | 5 |
| Joan E. Gray | 5 | 5 |
| Janet L. Gray | 5 | 5 |
| John R. Gray | 5 | 5 |
| Laurie J. Gray | 5 | 5 |
| Totals | 100 | 100 |

In January 1954 Gray transferred by gift 3 shares of his Omark 1959 stock to each of his three children, Anne L. Gray, Joan E. Gray, and Janet L. Gray, and 5 shares to his wife, Elizabeth N. Gray. Furthermore, Gray transferred 3 shares to each of two other children, John R. Gray and Laurie J. Gray, in January 1955 and April 1957, respectively. After all of these transfers, the stock of Omark 1959 was owned as follows:

| Stockholder | Number of shares | Percentage ownership |
|---|---|---|
| John D. Gray | 30 | 60 |
| Elizabeth N. Gray | 5 | 10 |
| Anne L. Gray | 3 | 6 |
| Joan E. Gray | 3 | 6 |
| Janet L. Gray | 3 | 6 |
| John R. Gray | 3 | 6 |
| Laurie J. Gray | 3 | 6 |
| Totals | 50 | 100 |

Immediately after its formation, Omark adopted a June 30 fiscal year. At the time its stock was acquired by Gray, Omark 1959 was on a fiscal year ending at the end of February. At a board of directors meeting held on October 25, 1954, Omark 1959 changed its fiscal year to a June 30 fiscal year, beginning with the fiscal year ending June 30, 1955, in order to have its fiscal year coincide with Omark's fiscal year.

The type of saw chain manufactured by Omark and Omark 1959 was generally referred to as "chipper type" saw chain and was manufactured under a combination of certain basic United States and Canadian patents issued to Max Merz (hereinafter referred to as Merz) and Cox, the inventors. A patent grant is a negative right in that it gives the owner thereof the right to exclude others from manufacturing the subject matter of the patent.

The significant feature of the Merz saw chain is that the cutter on the sideplate of each link of chain had a curved portion, whereas prior cutters were L-shaped. The Cox saw chain modified the Merz design

by flattening the top thus producing a curved portion and a flat toe. This improved cutting characteristics and permitted sharpening in the field. The Merz patents gave the owner thereof the right to exclude others from making a saw chain with a cutter on a sideplate having a curved portion. The Cox patents gave the owner thereof the right to exclude others from manufacturing a saw chain with a cutter on a sideplate having a curved portion and a flat toe.

Both the Merz and the Cox patents were valid. The later Cox patent was valid because it contained a needed improvement over the Merz patent. It was necessary for a manufacturer to have licenses under both the Merz and the Cox patents in order to make Cox chipper chain. That is, the Cox patent could not be used without infringing upon the Merz patent.

In 1960 Omark was the sole owner of the basic Cox United States saw chain patent and corresponding patents in all foreign countries except Canada. In 1960 Omark 1959 was the sole owner of the basic Cox Canadian saw chain patent. In 1960 Draper Corp. was the owner of the Merz United States and Canadian patents.

By agreement entered into on November 14, 1956, Draper Corp. (hereinafter referred to as Draper) owner/assignee of the United States and foreign Merz patents granted to Oregon Saw Chain Corp. (Omark) an irrevocable, royalty-free, nonexclusive license with respect to the United States, Canadian, and other foreign Merz patents. The agreement further provided that the Merz Canadian patents "may be sublicensed or assigned" by Oregon Saw Chain Corp. (Omark) to Oregon Saw Chain Ltd. (Omark 1959). In exchange Omark granted Draper an irrevocable, royalty-free, nonexclusive license with respect to the Cox United States patents and Omark 1959 granted Draper an irrevocable, royalty-free, nonexclusive license with respect to the Cox Canadian patents.

At the end of 1960 Omark 1959 did not have in its own right a license under any of the Merz patents, United States or Canadian. Although the agreement of November 14, 1956, gave Omark the right to sublicense Omark 1959 with respect to the Merz Canadian patents Omark did not do so. Omark 1959 was able to manufacture Cox chipper chain only at the sufferance of Omark; it had no independent right to use the Merz patents which were essential to the manufacture of saw chain under the Cox patents.

Apart from Omark only McCullock Motors Corp., Borg-Warner Corp., Mall Tool Co., and Pioneer Saws Ltd. had licenses under the Merz Canadian patents. However, none of these licensees had the right to sublicense as of 1960. For this reason any prospective purchaser of Omark 1959 (other than Omark) would of necessity have to

negotiate directly with Draper, the owner of the Canadian Merz patent, for a license. From October 4, 1956, when Engineering Research, Inc., assigned the Merz patents to Draper until 1963 when Omark acquired the Draper saw chain business, Draper issued licenses under the Merz patents only in exchange for a needed cross-license of the Cox patents from Omark and to replace commitments which existed prior to the acquisition of the Merz patents by Draper.

The Cox chipper chain was commercially successful; comprising approximately 95 percent of the total commercial chain sold. The Cox chipper chain eliminated all other types of saw chain from the market and was responsible in large part for the success of the Omark companies. Omark and Omark 1959 marketed Cox chipper chain under the trademark "Oregon." By the end of 1960 Oregon chain was considered the best available in the United States, Canada, as well as 50 to 60 other countries where saw chain was sold. On June 15, 1955, Omark granted Omark 1959 a license to use the "Oregon" trademark but retained the right to terminate upon 30 days' written notice.

During the period after their acquisition by Gray, Omark and Omark 1959 substantially increased their export sales of saw chain to foreign markets. Omark's and Omark 1959's export sales of saw chain for their taxable years ended June 30, 1956, through June 30, 1960, were as follows:

| Taxable year ended June 30— | Saw chain export sales in feet | |
|---|---|---|
| | Omark | Omark 1959 |
| 1956 | minor | 9, 400 |
| 1957 | minor | 12, 600 |
| 1958 | 66, 081 | 30, 800 |
| 1959 | 67, 428 | 58, 300 |
| 1960 | 127, 006 | 328, 500 |

By October 28, 1959, a potential conflict had arisen between Gray and Cox as a result of the expanding foreign sales activities of Omark and Omark 1959. This potential conflict had its origin in the different royalty rates provided in the sale agreements entered into with Oregon Saw Chain Corp., Cox's corporation, on November 20, 1953, both of which were distributed to Cox when Oregon Saw Chain Corp. was liquidated on December 2, 1953. Because of this rate differential, it was in Gray's best interest to have as high a percentage of export sales as possible made by Omark 1959, since this would have resulted in the payment of royalties at the lower 5-percent rate provided in the contract between Omark 1959 and Cox, as successor to Oregon Saw Chain Corp. Conversely, it was in Cox's best interest to have export sales made by Omark, since this would have resulted in the payment of royalties at the higher 10-percent or 15-percent rate provided in the contract between Omark and Cox, as succesor to Oregon Saw Chain Corp.

In order to resolve this conflict, Gray and Cox reached an agreement, not reduced to writing, to modify the agreement between Omark and Cox and to cancel the agreement between Omark 1959 and Cox, the latter in return for a lump-sum payment to Cox. Thereafter, on September 1 and October 1, 1959, Cox sold all of his right, title, and interest under the sale agreements with Omark and Omark 1959, respectively, to Pacific Plywood Co. (hereinafter referred to as Pacific), an Oregon corporation unrelated either to Cox, Gray, Omark, or Omark 1959.

On October 28, 1959, Omark and Gray entered into an agreement with Pacific amending the royalty provisions of the original sale contract between Omark (then Oregon Chain Corp.) and Oregon Saw Chain Corp. to provide for the payment thereunder of specified dollar royalty amounts on export sales by Omark (excluding export sales to Omark 1959) for each of the remaining years under the original sale contract if the percentage royalties due thereunder did not equal or exceed those specified amounts. Omark 1959 and Gray entered into an agreement with Pacific whereby Omark 1959 agreed to pay to Pacific a lump-sum of $245,000 to cancel and terminate the sale agreement of November 20, 1953. In addition, said agreement restricted Omark 1959's ability to sell its products in the United States through November 30, 1963, by requiring Omark 1959 to pay Pacific a royalty equal to 10 percent of such sales (exclusive of sales to Omark) through that date.

Following their acquisition by Gray, Omark and Omark 1959 grew and prospered under Gray's leadership and supervision. Omark built and moved into a new plant in Portland, Oreg., in 1955, and Omark 1959 built and moved into a new plant in Guelph, Ontario, Canada, in the same year.

Omark's assets, net worth, net sales, and after-tax profits for its taxable years ended June 30, 1954, through June 30, 1960, were as follows:

| Year ended June 30— | Assets | Net worth | Net sales | After-tax profits |
|---|---|---|---|---|
| 1954 [1] | $1,735,654 | $285,510 | $2,228,875 | $275,510 |
| 1955 | 3,162,242 | 996,979 | 5,810,902 | 697,703 |
| 1956 | 4,798,033 | 1,989,866 | 7,691,001 | 992,888 |
| 1957 | 7,540,942 | 2,879,383 | 10,146,659 | 889,516 |
| 1958 | 6,366,438 | 2,956,833 | 8,610,742 | 195,187 |
| 1959 | 7,114,255 | 3,845,477 | 8,709,565 | 887,585 |
| 1960 [2] | 7,635,030 | 4,518,552 | 10,574,518 | 719,110 |

[1] For the 7 months ended June 30, 1954.
[2] The amounts given for 1954 through 1959 are on an unconsolidated basis, while the amounts for 1960 are on a consolidated basis.

Omark 1959's assets, net worth, net sales, after-tax profits, and accumulated earnings for its taxable year ended February 28, 1955, were

$391,552,[3] $191,517, $792,933, $148,901, and $186,517 (Canadian dollars), respectively. The corresponding figures for Omark 1959's taxable years ended June 30, 1955, through June 30, 1963, all on an unconsolidated basis and all stated in Canadian dollars, were as follows:

| Year ended June 30— | Assets | Net worth | Net sales | After-tax profits | Accumulated earnings |
|---|---|---|---|---|---|
| 1955 [1] | $397,458 | $238,237 | $217,466 | $45,876 | $233,237 |
| 1956 | 816,964 | 525,988 | 1,428,903 | 283,577 | 520,988 |
| 1957 | 1,335,373 | 929,499 | 1,913,627 | 403,416 | 924,499 |
| 1958 | 1,253,150 | 1,070,589 | 1,372,377 | 139,075 | 1,065,589 |
| 1959 | 1,787,578 | 1,267,239 | 1,522,427 | [2] 198,937 | 1,262,239 |
| 1960 [3] | 2,470,431 | 1,628,869 | 2,704,411 | 361,630 | 1,623,869 |
| 1961 | 1,745,104 | 1,745,104 | 1,777,172 | 198,455 | 1,740,104 |
| 1962 | 1,744,885 | 1,744,423 | none | (681) | 1,739,423 |
| 1963 | 1,761,397 | 1,756,397 | none | 16,974 | 1,756,397 |

[1] For the 4 months ended June 30, 1955.
[2] Includes $98,659 royalty payment by Pioneer Saws Ltd. on Apr. 29, 1959, as the first installment of a $300,000 lump-sum settlement of a patent infringement suit.
[3] Includes dividend of $30,493 upon liquidation of a subsidiary (not taxable in Canada); a profit of $41,153 (not taxable in Canada) received with respect to the same liquidation; a royalty of $29,443 received from Pioneer Saws Ltd. pursuant to the above-described settlement.

On December 31, 1960, the earned surplus of Omark 1959 was $1,822,325 (Canadian dollars).

During the period after acquisition by Gray and continuing through 1960, both Omark and Omark 1959 began to manufacture and sell products other than saw chain and related accessories. For example, in September 1956, Omark purchased from Cox all of the tangible and intangible assets used by Cox in the business of manufacturing and selling powder-actuated tools and related fasteners. Cox had acquired these assets in October of 1955 from Powder-Power Tool Corp. In October of 1959 Omark began manufacturing and selling welding products with the acquisition of the assets of the Graham Manufacturing Co. Omark 1959 acquired from Cox in September of 1956 all of the stock of Omark Industries Ltd., a Canadian corporation, which also was engaged in the business of manufacturing and selling powder-actuated tools and related fasteners in Canada. Omark Industries Ltd. was liquidated into Omark 1959 at the beginning of Omark 1959's fiscal year ended June 30, 1960. Omark 1959 acquired a minority stock interest in 1958, in Sporting Arms Ltd., Clovelly Park, South Australia, which was engaged in the business of manufacturing and selling firearms and powder-actuated tools and accessories. Additionally, Omark 1959 acquired all of the stock of Canadian Fastening Systems Ltd. (hereinafter referred to as Canadian Fastening) in October 1959, and all of the stock of Montreal Motor Boat Co. Ltd.

---

[3] When discussing the financial statements of Omark and Omark 1959 we have rounded the amounts off to the nearest dollar.

(hereinafter referred to as Montreal Motor Boat) in February 1960, both of which companies were at the time of acquisition, and had been for some time, major distributors of saw chain for Omark 1959 in Canada. Canadian Fastening was also engaged in the business of selling pins for powder-actuated tools; and Montreal Motor Boat was also engaged in the business of selling marine and boating products. They were not engaged in the manufacture of saw chain. At the time of their acquisition both companies had losses relating to activities other than chain sales. They were acquired by Omark 1959 to protect important sources of distribution and to provide diversification.

After their acquisition by Omark 1959, both Canadian Fastening and Montreal Motor Boat continued to serve as saw chain distributors for Omark 1959 in Canada and, therefore, were treated by Omark 1959 as sales branches.

Even after the new direct and indirect product-line acquisitions by Omark and Omark 1959, their major products continued to be saw chain. For example, for their fiscal years ended June 30, 1960, the consolidated sales, stated in Canadian dollars, of Omark, Omark 1959, and their respective sales subsidiaries were broken down by product-lines as follows:

| Product | Omark and subsidiaries | Omark 1959 and subsidiaries | Total | Percentage to total |
|---|---|---|---|---|
| Saw chain | [1] $6,230,000 | $2,105,000 | $8,335,000 | 60.00 |
| Saw chain bars | 618,000 | 220,000 | 838,000 | 6.03 |
| Saw chain accessories | 515,000 | 91,000 | 606,000 | 4.35 |
| Powder-actuated tools and accessories | 2,024,000 | 412,000 | 2,436,000 | 17.54 |
| Welding products | 978,000 | 25,000 | 1,003,000 | 7.22 |
| Marine equipment | | 265,000 | 265,000 | 1.91 |
| Other products | 380,000 | 27,000 | 407,000 | 2.93 |
| Totals | 10,745,000 | 3,145,000 | 13,890,000 | 99.98 |

[1] Amounts are rounded off to the nearest $1,000.

Canadian Fastening and Montreal Motor Boat produced the following operating results, stated in Canadian dollars, for their respective 1956 through 1960 calendar years:

| Calendar year | Canadian Fastening after-tax profit (loss) | Montreal Motor Boat after-tax profit (loss) |
|---|---|---|
| 1956 | ($19,450) | $18,217 |
| 1957 | (25,640) | 17,756 |
| 1958 | (22,750) | (40,689) |
| 1959 | (19,075) | (156,683) |
| 1960 | (20,013) | (156,611) |

Omark Industries Ltd. produced the following operating results, stated in Canadian dollars, for its fiscal years of operation prior to its liquidation into Omark 1959:

| Fiscal year ended | Profit (loss) |
|---|---|
| Mar. 31, 1957 | ($21,198) |
| Mar. 31, 1958 | 28,911 |
| June 30, 1958 [1] | 4,542 |
| June 30, 1959 | 14,886 |

[1] This represents a 3-month period.

If the after-tax profits or losses of Canadian Fastening, Montreal Motor Boat, and Omark Industries Ltd., are combined with Omark 1959's after-tax profits for its taxable years ended June 30, 1956, through June 30, 1960, and if the certain, nonrecurring items of income set forth above are eliminated from Omark 1959's after-tax profits for its taxable years ended June 30, 1959, through June 30, 1960,[4] Omark 1959's after-tax profits, expressed in Canadian dollars, were as follows:

| Omark 1959 taxable year ended June 30— | Adjusted after-tax profits |
|---|---|
| 1956 | $282,344 |
| 1957 | 374,334 |
| 1958 | 109,089 |
| 1959 | (10,594) |
| 1960 | 97,917 |

The combined after-tax profit of Omark 1959, Canadian Fastening, and Montreal Motor Boat for the 6-month period ended December 31, 1960, was $114,276 (Canadian dollars).

The manufacturing equipment of Omark 1959 was modern and up-to-date in 1960. The plant was 5 or 6 years old at the time and already needed expansion, but the physical facilities were in good condition and the building and equipment on the inside were good. The machinery and equipment utilized in the manufacturing process were modern and well maintained. All parts for machinery in Guelph and in Portland were interchangeable.

Omark 1959 employed approximately 200 trained people in Canada. It had its own sales organization in Canada and its own shipping department. Omark 1959 employed some industrial engineers in Guelph who worked on systems and industrial procedure. In addition, Omark 1959 had some managerial personnel at its Guelph plant.

However during the period following their acquisition by Gray and continuing throughout 1960, Omark 1959 was dependent on Omark from the standpoint of corporate organization and administrative structure, product research and development, development of production methods and machinery, patent licensing and prosecution, advertising and sales promotion, staff training, personnel management

[4] The $98,659 patent infringement settlement payment in the 1959 year and the $29,443 royalty income in the 1960 year, the only taxable items under the laws of Canada, were reduced for this purpose to $48,659 and $15,443, respectively, in order to allow for estimated Canadian income taxes paid thereon by Omark 1959.

and planning, quality control, selection of outside professional representation (e.g., auditors), and accounting systems and procedures. In February of 1961 Omark had approximately 400 employees. Omark 1959 had no corporate policymaking employees of its own in Canada. At this time Omark was the owner of many major and minor patents, trademarks, and applications therefor in addition to the Merz and Cox patents. Omark 1959 owned only the Cox Canadian patent.

By the end of 1960 Omark and its branches in the United States occupied approximately 175,300 square feet of manufacturing, warehousing, and selling space. Omark 1959 and its selling subsidiary had approximately 53,500 square feet of comparable space. Omark was the "home office" of the companies as a whole and was the place where all major decisions were made and where the major expertise in all areas of company operations was located. Gray regarded Omark 1959 as a "branch" operation of Omark. Gray possessed ultimate responsibility for the overall supervision, management, and policymaking for both corporations; and he devoted his full-time efforts to the discharge of these responsibilities. While many of the minor or routine day-to-day decisions of both corporations necessarily were made by personnel other than Gray, all final decisions on important organizational, operational, policy, and personnel matters were made by Gray himself. Gray's skills as a corporate executive and his permeating influence in the major decisions and activities of Omark and Omark 1959 were major factors in their profitability.

Aside from the terminable license granted by Omark to Omark 1959 to use the "Oregon" trademark there were no contracts between the two corporations requiring a continuing relationship. There were no employment contracts, management contracts, or purchasing agreements.

All export sales made by Omark 1959 through the end of 1960 were solicited and obtained by Omark through the efforts of Omark's own export staff and sales personnel in the United States and abroad. The export policies of both Omark and Omark 1959 were determined by an export policy committee created by Gray and comprised entirely of Omark employees in Portland. Omark 1959 had no export department or export sales staff of its own and engaged in no export selling efforts at any time through the end of 1960. Omark merely channeled export sales obtained by it during this period through Omark 1959. Omark 1959's profitability was dependent on a high volume of saw chain sales, its export sales, amounted to approximately one-third of its total saw chain sales in its year ended June 30, 1960.

By the end of 1960 the percentage of outstanding stock of Omark owned by Gray, his wife and children had decreased from 100 percent

to 90.4 percent as a result of the sale by Gray of a portion of his Omark stock to various key officers and employees of Omark and other persons not connected with Gray or Omark.

In January of 1960 the Omark stock was split 2,000 for 1. A total of 5 percent of Gray's stock or 10,000 shares was sold by Gray to certain key officers and employees for a total of $241,100; the sales being made subject to repurchase by Gray in the event of the termination of the purchaser's employment. The remaining 4.6 percent or 9,148 shares were sold during the period from June 24, 1959, through September 10, 1960, to unrelated persons for $324,657.52. However, Gray, his wife, and children continued to own 100 percent of the outstanding stock of Omark 1959 throughout 1960. Gray expected to continue the policy of reducing his family's percentage ownership in Omark in succeeding years, culminating in a public sale of a portion of their Omark stock not later than the end of 1964, at which time Omark's royalty obligation to Pacific would be ended. The eventual public sale of some of his and his family's Omark stock had been contemplated by Gray in earnest as early as June 1959. In fact, such public sale was consummated in 1964. Since that time Omark stock has been listed on the New York Stock Exchange. Presently the Gray family owns 37.4 percent of the outstanding stock of Omark, the other 62.6 percent being owned by approximately 7,000 other stockholders.

By the end of 1960 certain problems had arisen as a result of the operation of Omark and Omark 1959 as brother-sister corporations. First, because of the fact that Gray and his family owned 100 percent of the stock of Omark 1959 but only 90.4 percent of the stock of Omark, it was in the best interests of Gray and his family to have export sales made by Omark 1959. Conversely, the interests of the minority stockholders of Omark were best served by having Omark make these export sales. Controversies arose out of these potential competing interests at various times prior to the end of 1960. Gray felt an obligation to provide fair treatment to the minority stockholders of Omark, and, therefore, it was his desire to avoid any semblance of favoritism for Omark 1959 over Omark. Second, the above competing interests also led to dissatisfaction among the employees of Omark and Omark 1959, since contributions to profit-sharing plans established by the two corporations were directly dependent upon the profitability of each corporation, which in turn, was dependent upon the volume of export sales. Third, the brother-sister corporate relationship produced certain conflicts between the managements of the two corporations, since in certain areas (e.g., future international growth and expansion) their objectives were not always the same. Fourth, since Omark 1959 was dependent upon Omark, questions arose as to the amount of costs

being incurred by Omark for services performed by it for Omark 1959. Fifth, since Gray intended to have Omark engage in additional corporate acquisitions, he wanted to avoid problems involved in assimilating the acquired companies into the existing brother-sister structure.

In addition to the above reasons for realigning the operations of the two corporations, a separate and equally important reason for such realignment was to prepare Omark for the eventual public sale of its stock by 1964 by Gray and his family and other stockholders. Gray was advised by underwriters that the stock of Omark would be unattractive for a public offering until the conflicting interests between Omark and Omark 1959 had been eliminated. In determining what course of action to follow Gray considered income tax aspects, both United States and Canadian; for this purpose he employed certain advisers, expert in matters of taxation.

The decision to realign the operations of Omark and Omark 1959 was carried into effect in December 1960. As the first step in this realignment, on December 22, 1960, Omark organized a new wholly owned Canadian subsidiary, Omark Industries (1960) Ltd. (hereinafter referred to as Omark 1960), transferring $200,000 (Canadian dollars) to Omark 1960 in return for all of its authorized common stock, 20,000 shares of no-par value. Omark 1960's authorized capital also included 18,000 shares of preferred stock of $100 (Canadian dollars) par value which, pursuant to its certificate of incorporation, (a) were entitled to noncumulative dividends in the discretion of Omark 1960's board of directors at the annual rate of 5 percent prior to any dividends on the common stock; (b) were redeemable at any time in the discretion of Omark 1960 at par value plus any declared but unpaid dividends; (c) enjoyed a preference in the distribution of assets upon liquidation; and (d) were entitled to one vote per share upon Omark 1960's failure to pay dividends thereon for 2 consecutive years and retained such voting rights until dividends aggregating 5 percent per year had been paid on the preferred shares for 2 consecutive years.

On December 27, 1960, Omark 1959 entered into an agreement with Omark 1960 whereby Omark 1959 sold all of its assets to Omark 1960, including the stock of Canadian Fastening, Montreal Motor Boat, and Omark International Ltd.,[5] excluding an $80,000 (Canadian dollars) note payable from Gray to Omark 1959. In consideration for these assets, Omark 1960 agreed to assume all of Omark 1959's liabilities and to pay Omark 1959 (a) 18,000 shares of Omark 1960 preferred stock, (b) $10,000 (Canadian dollars) cash, and (c) a promissory

---

[5] Omark International Ltd. was a wholly owned subsidiary of Omark 1959.

note bearing interest at 5 percent per year for the balance of the purchase price. The total purchase price was equal to the book value of the assets of Omark 1959 as of December 31, 1960.

The December 27, 1960, agreement was superseded by mutual agreement of both parties by a new sale agreement dated June 5, 1961. The June 5, 1961, agreement provided that Omark 1959 sell to Omark 1960 as of December 31, 1960, all of its assets except for notes in the amounts of $80,000 (Canadian dollars) and $35,000 (Canadian dollars) due to Omark 1959 from Gray and Molded Container Corp. (an Oregon corporation 52 percent of the stock of which was owned by Gray), respectively. In consideration for these assets, Omark 1960 agreed to assume all of Omark 1959's liabilities in the amount of $1,223,623 (Canadian dollars), and to pay Omark 1959 (a) 15,000 shares of Omark 1960 preferred stock of $100 (Canadian dollars) par value per share, having a fair market value of $1 million (Canadian dollars), (b) $10,000 (Canadian dollars) in cash, and (c) the balance ($82,604) (Canadian dollars) on open account. The total purchase price was equal to the book value of the assets as of December 31, 1960.[6]

The assets sold by Omark 1959 to Omark 1960 and their respective book values, stated in Canadian dollars, were as follows:

| Asset | Book value |
| --- | --- |
| Cash | $600 |
| Marketable securities | 98,000 |
| Accounts receivable, including accounts receivable from subsidiaries | 801,229 |
| Accounts receivable from Sporting Arms Ltd. and Svenska Oregon A.B. | 388,086 |
| Inventories | 534,609 |
| Prepaid expenses | 21,536 |
| Investments in subsidiaries | 209,798 |
| Investment in Sporting Arms Ltd. | 114,695 |
| Land | 49,333 |
| Buildings, machinery, and equipment | 558,829 |
| Patents | 39,512 |
| Total | 2,816,227 |

On a consolidated basis, the book values, stated in Canadian dollars, of the assets of Omark 1959, Canadian Fastening, Montreal Motor

[6] The parties stipulated herein that the total purchase price was equal to the book value of Omark 1959's assets as of Dec. 31, 1960; i.e., $2,816,227 (Canadian dollars). However, in a supplemental stipulation the parties agreed that the fair market value of the Omark 1960 preferred was $1 million (Canadian dollars) from Dec. 31, 1960, through Sept. 26, 1962.

Boat, and Omark International Ltd. sold to Omark 1960 on December 31, 1960, were as follows:

| Asset | Book value |
|---|---:|
| Cash | $45, 575 |
| Marketable securities | 98, 000 |
| Accounts receivable, excluding accounts receivable from subsidiaries | 603, 845 |
| Accounts receivable from Sporting Arms Ltd. and Svenska Oregon A.B | 388, 086 |
| Inventories | 784, 159 |
| Deferred accounts receivable | 100, 000 |
| Prepaid expenses | 24, 561 |
| Investment in Sporting Arms Ltd | 114, 695 |
| Land | 49, 333 |
| Buildings | 171, 810 |
| Equipment | 402, 283 |
| Leasehold improvements | 39, 407 |
| Patents | 201, 057 |
| Goodwill | 1, 500 |
| Total | 3, 024. 311 |

The total liabilities of Omark 1959, Canadian Fastening, and Montreal Motor Boat on December 31, 1960, were $1,268,663 (Canadian dollars). Omark International Ltd. was inactive and had no liabilities. Thus, the net book value of the assets of Omark 1959, Canadian Fastening, Montreal Motor Boat, and Omark International Ltd., sold to Omark 1960 on December 31, 1960, was $1,755,648 (Canadian dollars) ($3,024,311 less $1,268,663).

On June 13, 1961, the name of Omark 1959 was changed to Yarg Ltd. (hereinafter referred to as Yarg). Yarg had had ceased manufacturing operations on December 31, 1960, after the sale of its operating assets to Omark 1960.

Pursuant to Gray's intention that Yarg be a real estate investing corporation, the company sought investments for its liquid assets. By mid-1962 Yarg had made certain investments in, or loans to, Molded Container Corp. (hereinafter referred to as Molded), Sunset Science Park, Inc., and Northwest Science Investment Corp., all located in Portland, Oreg. As of June 1, 1962, Gray owned 52 percent of the outstanding shares of Molded. From May 15, 1960, through October 20, 1961, Gray had loaned Molded $83,723 (Canadian dollars) ; by December 31, 1961, Molded had repaid $3,723. On October 26, 1960, Yarg made a loan to Gray in the amount of $80,000 (Canadian dollars). On June 30, 1961, Gray repaid said amount to Yarg by transferring to Yarg the notes due to him from Molded in the total amount of $80,000. A new note dated June 30, 1961, was executed by Molded to Yarg as evidence of said indebtedness. Said note provided for 6-percent interest per year commencing October 1, 1961. During the period from

December 31, 1960, through October 27, 1961, Yarg made five separate loans to Molded in the total amount of $110,000 (Canadian dollars). These loans were evidenced by interest-bearing promissory notes from Molded to Yarg. No repayments were made by Molded to Yarg as of the end of 1961. On June 30, 1961, Yarg purchased from Gray an $80,000 interest-bearing note due to Gray from Molded, thus bringing Yarg's total investment in Molded by way of loans to $190,000. On February 16, 1962, Yarg converted $18,000 of these loans into 9,375 shares of stock of Molded; and on February 19, 1962, Yarg purchased from Molded an additional 8,639 shares of its stock for $17,278 (Canadian dollars). On June 28, 1962, Yarg sold notes of Molded in the face amount of $172,000, representing the remaining balance of its loans to Molded, to Omark for a purchase price equal to their face value. In addition to the transactions with Molded, Yarg by August 1962 had loaned approximately $104,000 (Canadian dollars) to Sunset Science Park, Inc., an Oregon corporation engaged in development of a planned industrial park in Portland, and had invested $15,000 (Canadian dollars) in Northwest Science Investment Corp., an Oregon corporation which was a diversified small business investment corporation, serving small science based industries in the Pacific Northwest.

During the latter part of 1961 and continuing into 1962 Yarg employed various agents for the purpose of discovering and/or investigating possible real estate acquisitions or investments in Portland, Toronto, Vancouver, and Winnipeg. No such acquisitions were made by Yarg.

As of June 30, 1962, Yarg's balance sheet, stated in Canadian dollars, indicated the following:

### ASSETS

| | | |
|---|---:|---:|
| Current assets: | | |
| Cash at bank | | $161,996 |
| Capital and place of business taxes refundable | | 736 |
| Total current assets | | 162,732 |
| Investments in and advances to affiliated companies: | | |
| Investment in Omark Industries (1960) Ltd.: | | |
| 15,000 preferred shares at cost | $1,500,000 | |
| Investment in Molded Container Corporation—18,014 | | |
| common shares at cost | 35,278 | |
| Investment in Northwest Science Investment Corp.— | | |
| 15,000 common shares at cost | 15,000 | |
| Advance to Sunset Science Park, Inc. | 31,875 | |
| Total investments and advances | | 1,582,153 |
| Total | | 1,744,885 |

In June 1961 Omark 1960 had paid a dividend to Yarg on the preferred stock held by Yarg in the amount of $37,500 (Canadian dollars) representing one-half year's dividend (from January 1, 1961).

By mid-1962 a new factor had entered the picture to cause Gray to reevaluate the continuing role Yarg was to play. This was the impending enactment of the Revenue Act of 1962, which added, of particular significance, section 1248 to the Internal Revenue Code of 1954. Serious uncertainties were presented to Gray by his attorneys as to the tax problems that could arise with respect to Gray, his wife and children by reason of the various early versions of section 1248 if they retained their ownership in the corporation. A letter addressed to Gray from his attorney, dated April 20, 1962, stated, concerning the proposed legislation, in part, as follows:

Section 18 of the Act eliminates the present estate tax exclusion for foreign real estate. This reduces the incentive for you to build an estate in Canada.

The provision of the Act which concerns me most is Section 18 which states that redemptions or liquidation distributions to U.S. stockholders from a controlled foreign corporation will be taxed as dividend income instead of capital gain. If enacted this would virtually eliminate the possibility of liquidating Yarg, Ltd., in the future. This provision is to be made *effective upon enactment* of the Act, unlike the other sections I mentioned which will be effective after the end of 1962 or later. I recognize this Section may be modified as to effective date or it may be made to apply only to earnings accumulated after the enactment of the Act but I am reluctant to rely on this.

Because of the uncertainties presented to Gray by his attorneys as to the tax problems that could arise under the early versions of the bill, Gray concluded that it would be best to terminate such ownership; this decision was not made by Gray until the latter part of August 1962. Because of the sense of urgency created by the effective date provision referred to above, Gray concluded that the termination of their Yarg stock ownership should take place at the earliest possible date.

Having decided to terminate the Yarg stock ownership as quickly as possible, the next decision to be made by Gray was the manner in which that ownership would be terminated. Gray again consulted with his attorneys, who advised him that there were two alternative routes which could be followed. First, he was advised that Yarg could be liquidated, which it was stated might result in ordinary income. Second, he was advised that the stock of Yarg could be sold to an unrelated third-party purchaser at capital gains rates. Faced with these alternatives, Gray chose the stock sale route. If Gray had known that there was any substantial possibility that the sale of the Yarg stock would have resulted in ordinary income, the sale would not have taken

place, since he would have retained only 10 percent of the sale proceeds after taxes at ordinary rates.

Having decided to sell the Yarg stock, it became necessary to locate an unrelated purchaser for the stock. To this end, Gray asked his attorney, Donald J. Griswold (hereinafter referred to as Griswold) of the law firm of Pattullo, Gleason & Griswold, Portland, Oreg., and two well-known investment banking firms, Dean Witter & Co. of San Francisco, Calif., and Blyth & Co. of New York, N.Y., to assist him in his efforts to find a purchaser. Efforts were then expended by all parties to find a purchaser. Dean Witter & Co. made an offer of the stock to Investors Diversified Services, a large mutual fund in Minneapolis, Minn., discussed the matter with one of the governors of the Investment Bankers Association and made several offers of the stock through its Montreal office. Griswold, working through an attorney of his acquaintance, Hugh Guthrie, of the law firm of Hungerford, Gamble & Guthrie of Guelph, Ontario, Canada, came in contact with another attorney, David Ward (hereinafter referred to as Ward) of the law firm of Macdonald, Davies & Ward of Toronto, Canada. In turn, Ward introduced Griswold to Frank H. Cameron (hereinafter referred to as Cameron), a resident of Vancouver, British Columbia, Canada. Subsequently, in early September 1962, Griswold discussed the matter by telephone with Cameron, who expressed an interest in purchasing the stock of Yarg. Griswold had never known or heard of Cameron prior to being put in touch with him by Ward in September 1962.

On September 11, 1962, Cameron met in Griswold's law offices in Portland with Griswold and with David S. Pattullo (hereinafter referred to as Pattullo), one of Griswold's law partners, and Fred H. Torp (hereinafter referred to as Torp) of the law firm of Davies, Biggs, Strayer, Stoel & Boley of Portland, Oreg., who also represented Gray. Following his meeting with Griswold, Pattullo and Torp, Cameron prepared a letter dated September 11, 1962, addressed to Griswold's law firm which was transcribed by a secretary in Griswold's office, stating, in part, as follows:

This letter will be our undertaking that we will cause a group of investors in Vancouver, B.C. to purchase all of the issued shares of a company known as Yarg Ltd. for cash in an amount equal to the net book value less 4½[7] percent of undistributed income. It is our understanding that we will be supplied with a copy of a balance sheet of the Company certified by Deloitte, Plender, Haskins & Sells.

---

[7] The 4½-percent discount from the actual net book value of the Yarg stock represented compensation from Gray and the other sellers to the purchasers for accommodating the sellers on the sale of the Yarg stock.

Under the terms of an escrow agreement to be drawn, it is understood that we will not be bound to complete the purchase until the Company's assets are shown to be cash and that its only liabilities will be capital and surplus. It is further understood that the surplus as shown on the balance sheet will be comprised of undistributed income as defined by the Canadian income tax act in an amount not less than $1,500,000.00 and that net book value will not exceed $2,000,000.00. All sums mentioned in this letter are in Canadian funds.

The purchasers wanted to consummate the proposed transaction by September 27, 1962, in order to avoid any possible adverse changes in the Canadian tax laws that might have been enacted by Parliament and been made retroactive to the opening day of the legislative session.

After having Cameron and his enterprises investigated and being satisfied that he was reputable and financially sound, Griswold, Pattullo, and Torp recommended to Gray that he proceed with negotiations. Gray accepted their advice and instructed them to proceed.

Although the all-cash assets requirement in the offer of September 11, 1962, was not preferred by Gray and his agents, they did not advise Cameron of this at the time, and events after the receipt of the offer were moving rapidly and Gray's agents, although desiring to negotiate the term out of the contract, had not formulated a method of doing so. After Gray instructed them to proceed Griswold and Torp, acting on behalf of Gray, employed Harold Thompson (hereinafter referred to as Thompson) of the law firm of Campney, Owen & Murphy, Vancouver, British Columbia, to assist them in the negotiations with Cameron and in the consummation of the sale transaction. Griswold and Torp decided that they needed the guidance and advice of someone more expert in Canadian law than they were, since the transaction was going to be closed in Canada and involved the sale of a Canadian company to Canadian purchasers. Griswold and Torp then instructed Thompson that the requirement in Cameron's offer of September 11, 1962, that Yarg's assets had to be converted to cash before the sale of the stock took place was unacceptable to them and that in the negotiations with Cameron this requirement would have to be negotiated out. The requirement was unacceptable to Gray's advisers because it would have required a redemption by Omark 1960 of its preferred stock from Yarg, and they were concerned that such redemption prior to the sale might give rise to substantial tax liabilities to Gray, his wife and children in the United States. Consequently, it was desirable that any redemption of its preferred stock by Omark 1960 take place after the sale of the Yarg stock was final and complete.

On September 14, 1962, Yarg sold its stock investments in Molded and Sunset Science Park, Inc., and its loan investment in Northwest

Science Investment Corp. to Gray at book value. Thereafter the balance sheet, stated in Canadian dollars, of Yarg was as follows:

*Assets*

Current assets:

| | |
|---|---:|
| Cash at bank | $260, 661 |
| Capital and place of business taxes refundable | 736 |
| Total current assets | 261, 397 |

Investment in Omark Industries (1960) Ltd.:

| | |
|---|---:|
| 15,000 preferred shares, at cost | 1, 500, 000 |
| Total | 1, 761, 397 |

*Capital and surplus*

Capital stock:

| | | |
|---|---:|---:|
| Authorized, issued and fully paid—50 shares of a par value of $100 each | | 5, 000 |

Earned surplus:

| | | |
|---|---:|---:|
| Balance, June 30, 1962 | $1, 739, 423 | |
| Add gain on foreign exchange | 16, 974 | |
| Balance, Sept. 15, 1962 | | 1, 756, 397 |
| Total | | 1, 761, 397 |

On September 21, 1962, Griswold and Thompson, representing Gray, his wife, and children, met at the Marine Building Branch of the Bank of Montreal in Vancouver, British Columbia, with Cameron, the president of F. H. Cameron Ltd., his wholly owned Canadian corporation, David A. Bone, the president of Dabne Enterprises Ltd., another Canadian corporation wholly owned by Cameron (both of these corporations were engaged in the business of investment banking), W. John Thompson, and A. J. F. Peel, manager of the Marine Building Branch of the Bank of Montreal. The first transaction at that meeting was the delivery by Griswold, as agent for Gray, his wife, and children, of their Yarg stock certificates, together with the other indicia of corporate ownership, including the Yarg minute book, corporate seal, certificate of incorporation, and other corporate records, documents, and items, to F. H. Cameron Ltd. and Dabne Enterprises Ltd., the purchasers of the Yarg stock. The Yarg stock certificates had previously been endorsed in blank in Portland by Gray and his wife and the First National Bank of Oregon, Portland, Oreg., as guardian for the children and brought by Griswold to Vancouver. Immediately following the delivery of these stock certificates by Griswold, Dabne Enterprises Ltd. delivered to Griswold, as agent for Gray, a certified check dated September 21, 1962, payable to Gray, in

the amount of $840,700 and a document entitled "Invoice," which stated:

Purchased this 21st day of September, 1962, from John D. Gray, 25 shares of Yarg Ltd. stock for Eight Hundred and Forty Thousand Seven Hundred Dollars ($840,700.00) (Canadian Funds)

(S) DAVID A. BONE, *President*
DABNE ENTERPRISES LTD.

Simultaneously therewith, F. H. Cameron Ltd. delivered to Griswold, as agent for Gray, his wife, and children, a second certified check dated September 21, 1962, payable to Gray, his wife, and children, in the amount of $840,700 and a second "Invoice," which stated:

Purchased this 21st day of September, 1962, from John D. Gray, Elizabeth Neuner Gray, and First National Bank of Oregon (Portland), Guardian, 25 shares of Yarg Ltd. stock for Eight Hundred and Forty Thousand Seven Hundred Dollars ($840,700.00) (Canadian funds).

(S) F. H. CAMERON, *pres.*
F. H. CAMERON LTD.

On September 21, 1962, after the above-described transactions Gray, his wife, and the First National Bank of Oregon, Portland, Oreg., as guardian for the children, acting through their attorney-in-fact, Griswold, entered into an agreement with F. H. Cameron Ltd. and Dabne Enterprises Ltd. and with the Bank of Montreal, as escrow agent. Pursuant to this agreement, F. H. Cameron Ltd. and Dabne Enterprises Ltd. delivered to the Bank of Montreal as escrow agent the Yarg stock, properly endorsed by them, the 15,000 shares of Omark 1960 preferred stock owned by Yarg, the corporate records, documents, and other Yarg items, a certified check drawn in favor of Yarg in the amount of $261,396.61 (Canadian dollars), and certain other documents. Furthermore, pursuant to the agreement, Gray, his wife, and children acting through their attorney, Thompson, delivered to the Bank of Montreal as escrow agent the two $840,700 certified checks received by them, through Griswold, from F. H. Cameron Ltd. and Dabne Enterprises Ltd. in payment for the Yarg stock. Prior to such delivery to the escrow agent, the two checks had been endorsed on behalf of the payees by Griswold under the powers of attorney given to him by the payees. The Bank of Montreal, as escrow agent, agreed to hold the above documents, checks, and items in escrow and, if it received before 12 noon on September 26, 1962, the sum of $1,500,000 (Canadian dollars) from Omark 1960 in redemption from Yarg of the 15,000 shares of preferred stock of Omark 1960 then held by it in escrow, to (a) return the stock certificate representing the said preferred shares to Omark 1960 for cancellation; (b) return the two $840,700 certified checks to Gray; and (c) return the Yarg stock certificate and other Yarg records, documents, and items to Cameron. On

the other hand, the Bank of Montreal agreed (unless notified otherwise as indicated below) that if it did not receive the sum of $1,500,000 by 12 noon on September 26, 1962, it would, not later than the close of banking business on that day, (a) deliver the Yarg stock certificates and other Yarg records, documents, and items and the Omark 1960 preferred stock certificates to Thompson on behalf of Gray, his wife, and children; and (b) deliver two certified checks from F. H. Cameron Ltd. and Dabne Enterprises Ltd. to Cameron. However, the escrow agreement specifically gave F. H. Cameron Ltd. and Dabne Enterprises Ltd. the option to instruct the Bank of Montreal in writing prior to the close of banking business on September 26, 1962, to disregard the provisions of the agreement which would become operative if it did not receive the $1,500,000 redemption proceeds from Omark 1960 by 12 noon on September 26, 1962. The escrow agreement specifically stated that the parties intended for these provisions, taken together to grant to the "Purchasers" the right or option "in their sole discretion * * * to rescind the transaction relating to the sale and purchase of the said common shares of Yarg Ltd. and to have the purchase price thereof returned to them." The agreement recited that the "sale is final and complete prior" to the deposit in escrow, but, subject to the above-described option.

Two of the documents given by Gray to the Bank of Montreal pursuant to the terms of the escrow agreement were separate warranty agreements dated September 21, 1962, to F. H. Cameron Ltd. and Dabne Enterprises Ltd., the purchasers, wherein Gray warranted (a) that Yarg's capital stock consisted of 50 common shares of a par value of $100 per share; (b) that all of said shares were outstanding and were fully paid and nonassessable; (c) that Yarg had no binding obligation to issue additional shares; (d) that Yarg was validly organized and existing under the laws of Canada; (e) that Gray, his wife, and children owned the 50 outstanding Yarg shares and had full power to sell said shares free and clear of all claims, liens, and encumbrances; and (f) that a balance sheet attached thereto prepared by Yarg's auditors, Deloitte, Plender, Haskins & Sells, Toronto, Canada, correctly reflected the assets and liabilities of Yarg as of September 15, 1962. In said warranty agreements Gray agreed to "indemnify and hold harmless Yarg Ltd. with respect to any and all debts, liabilities and contracts" up to 2 p.m., September 21, 1962. Finally, in said agreements Gray and the purchasers agreed that as of September 15, 1962, Yarg was not entitled to receive any dividends from Omark 1960 on the preferred stock owned by Yarg and would not thereafter make any claim or demand for such dividends.

By letter to Griswold dated September 21, 1962, delivered to Griswold after the execution of the escrow agreement, W. John Thompson, the attorney for the purchasers, assured Gray, his wife, and children that Yarg would earn no income of any kind or character until after June 30, 1963, the last day of Yarg's current fiscal year. This letter was written by W. John Thompson at the request of Griswold, who was concerned with the possibility that a portion of the income earned by Yarg in that fiscal year even after Gray, his wife, and children had ceased to own the Yarg stock might be attributed to them under the foreign personal holding company provisions of the Internal Revenue Code of 1954. Thus, Griswold sought to avoid such possibility by receiving an assurance from the purchasers that no income would be earned by Yarg during the taxable year of Yarg in which Gray, his wife, and children ceased to be stockholders.

On September 21, 1962, after the transactions at the bank, the newly elected directors of Yarg, Cameron, Bone, and W. John Thompson, held a special meeting of the board of directors in Vancouver to ratify the transfer of the Yarg stock to F. H. Cameron Ltd. and Dabne Enterprises Ltd. and to approve the transfer of two shares of the newly acquired Yarg stock by each to certain nominees. At that meeting Cameron was elected as president of Yarg, and Bone was elected as its secretary and treasurer.

By letter dated September 22, 1962, addressed to Omark 1960 in Guelph, Yarg requested Omark 1960 to redeem the 15,000 shares of preferred stock owned by Yarg and to remit the redemption proceeds to the Marine Building Branch of the Bank of Montreal in Vancouver. The letter was signed on behalf of Yarg by W. John Thompson, who had been elected as a director of Yarg on the previous day. The above-described letter or a copy thereof had been presented to W. John Thompson by Thompson, attorney for the Grays, on September 21, 1962, at the bank. On September 25, 1962, by resolution of its board of directors at a special meeting held in Guelph, Ontario, Canada, Omark 1960 authorized the redemption of its 15,000 shares of preferred stock from Yarg, transmitting its check in the amount of $1,500,000 (Canadian dollars) for the redemption proceeds to the Bank of Montreal in Vancouver. Upon receiving said check on September 25, 1962, the Bank of Montreal complied with the terms of the escrow agreement, transmitting the stock certificate for the preferred stock to Omark 1960 for cancellation, returning the two $840,700 certified checks to Gray, his wife, and children, and returning the Yarg stock certificates and other Yarg records, documents, and items to Cameron.

The funds used by Omark 1960 came from the following loans arranged on September 17, 1962:

| Company | U.S. dollars | Canadian dollars (at .925) |
|---|---|---|
| Omark | $950, 000 | $1, 027, 026 |
| Omark International, Ltd. (Amsterdam) | 240, 125 | 259, 594 |
| Omark 1960 | 197, 375 | 213, 380 |
| Total | 1, 387, 500 | 1, 500, 000 |

Of the total amount provided to Omark 1960 by Omark, $450,000 was borrowed by Omark from the First National Bank of Oregon, Portland, Oreg., and an additional $450,000 was borrowed by Omark from the U.S. National Bank, Portland, Oreg.

At the close of its taxable year ended June 30, 1963, Omark 1960 had accumulated earnings and profits of $1,697,957 (Canadian dollars).

Throughout our Findings of Fact we have made reference to various sums of money as stated in Canadian currency. For purposes of computing tax liability the parties have stipulated that as of December 31, 1960, one Canadian dollar was equal to one United States dollar and for the period from September 21, 1962, to September 26, 1962, .9250 United States dollar was equal to one Canadian dollar.

The respondent's notice of deficiency to Gray for the taxable years 1960 and 1962 stated, in pertinent part, as follows:

(a) (1) It is determined (1) that the fair market value on December 31, 1960, of each of the following properties was as stated below:

(A) The entire business and all business assets subject to liabilities of Omark Industries (1959) Ltd.—$3,890,132.00

(B) All of the issued $100.00 par value noncumulative preferred stock (15,000 shares) of Omark Industries (1960) Ltd.—$300,000.00

(C) All of the issued common stock (20,000 shares) of Omark Industries (1960) Ltd.—$3,697,528.00

and (2) that you constructively received on December 31, 1960, $2,448,270.00 taxable as dividend income when you caused the following transactions to be effected as of said date:

(i) The transfer of (A), supra, from Omark Industries (1959) Ltd., your wholly owned Canadian corporation, to Omark Industries (1960) Ltd., your newly organized Canadian corporation.

(ii) The transfer of (B), supra, plus $92,604.00 in cash and accounts receivable from Omark Industries (1960) Ltd. to Omark Industries (1959) Ltd.

(iii) The transfer of (C), supra, from Omark Industries (1960) Ltd. to Omark Industries, Inc., your controlled Oregon corporation.

(iv) The transfer of $200,000.00 in cash from Omark Industries Inc., to Omark Industries (1960) Ltd.

It is further determined that you constructively received the above-stated dividends from Omark Industries (1959) Ltd. as a result of the above-indicated transactions. Since you failed to report said dividend income on your income tax return, your taxable dividend income is increased in the amount of $2,448,270.00 * * *

    *       *       *       *       *       *       *

(a)(3) It is determined that you and your children as the owners of all of the stock of Yarg, Ltd. (formerly Omark Industries (1959) Ltd.) together received therefrom on September 21, 1962, under the guise of escrow deposits, $241,792.00 in cash (in United States dollars) and 15,000 shares of the preferred stock of Omark Industries (1960) Ltd. having a fair market value (in United States dollars) of $277,500.00, and that you thereby received on said date $363,504.00, taxable as dividend income. Since you failed to report said dividend income on your income tax return, your taxable dividend income is increased in the amount of $363,504.00 * * *

(a)(4) It is determined that you owned 70% of the preferred stock of Omark Industries (1960) Ltd. on September 26, 1962, when said preferred stock was redeemed, and that you received $971,250.00 (in United States dollars) on such redemption which amount is taxable as dividend income because you constructively owned over 90% of said corporation's common stock both before and after September 26, 1962. Since you failed to report such amount on your income tax return, your taxable income is increased in the amount of $971,250.00 * * *

### OPINION

This case presents questions concerning transactions occurring in 2 taxable years, 1960 and 1962. We will first consider the events underlying the parties' controversy with respect to 1960.

It is the respondent's contention that the petitioners received a constructive distribution of property taxable as a dividend in December of 1960 in the total amount of $1,428,000.[8] Resolution of this issue necessitates consideration of four component questions. Due to the somewhat complex nature of this case the points at issue can be best explicated by reference to a brief summary of the facts.

During the period in question the petitioners owned 90.4 percent of the stock of Omark, an Oregon corporation engaged in the manufacture of saw chain and other products, and 100 percent of the stock of Omark 1959, a smaller Canadian corporation engaged in the same business. By the end of 1960, for various corporate and personal business reasons, the decision was made to realign the corporate relationship of the two companies. It was felt to be desirable to change their brother-sister relationship into that of parent and subsidiary, with Omark as the parent. In order to effectuate this overall plan, on December 22, 1960, Omark organized a new wholly owned Canadian subsidiary, Omark 1960. Omark transferred $200,000 to Omark 1960 in exchange for all of its authorized common stock, 20,000 shares of no-par value.

As of December 31, 1960, Omark 1959 agreed to sell to Omark 1960 all of its assets[9] (as set forth in our Findings of Fact) at their book

---

[8] In the portion of this Opinion concerned with the events of 1960, it is not necessary to distinguish between Canadian and United States currency. During 1960 the parties have stipulated that the rate of exchange was one United States dollar to one Canadian dollar.

[9] With the exception of certain notes due from Gray to Omark 1959.

value of $2,816,227 in return for (a) the assumption by Omark 1960 of the liabilities of Omark 1959 in the amount of $1,223,623, (b) 15,000 shares of Omark 1960 preferred stock having a par value of $100 per share and a fair market value of $1 million, (c) $10,000 in cash, and (d) $82,604 on open account.

It is presently the respondent's contention that the fair market value of the assets transferred by Omark 1959 exceeded the fair market value of consideration received from Omark 1960 by $1,428,000. From this premise the respondent has evolved two theories according to which this excess value comes to rest upon petitioners as constructive dividend income.

First, the respondent argues that Omark and Omark 1959 participated in a section 351 transaction in the formation of and transfer to Omark 1960. Further, he insists that since Omark 1959 received $1,428,000 too little the "true nature" of the transaction must be that Omark 1959 received $1,428,000 worth of the common stock of Omark 1960. Since all of Omark 1960's common stock ultimately came to rest with Omark and, because Omark 1959 had no reason to contribute the stock to Omark, the respondent contends that Omark 1959 must be deemed to have distributed the common stock to the petitioners who then contributed it to Omark. Respondent would tax as a dividend this "deemed" distribution from Omark 1959. The "true nature" test is derived from section 1.351-1(b)(1), Income Tax Regs.

The respondent's second theory is that without reference to section 351, and the regulations thereunder, the decided cases support respondent's position that the excess value transferred to Omark 1960 was a constructive dividend to petitioners by Omark 1959. The petitioners then contributed this dividend directly to Omark 1960 or indirectly to Omark 1960 through Omark.

From the foregoing synopsis three questions emerge for our consideration: The value of the assets transferred by Omark 1959 and the respondent's two theories concerning constructive dividends.

A fourth question is whether any assessment of a deficiency against John D. and Elizabeth Gray is barred by the statute of limitations. The parties agree that the year 1960 is barred unless the petitioners omitted from "gross income an amount properly includible therein which is in excess of 25 percent of the amount * * * stated in the return." Sec. 6501(e)(1)(A). It is well established that the burden of proving the existence of a 25-percent omission is upon the respondent. *Philipp Bros. Chemicals, Inc. (Md.)*, 52 T.C. 240, 254 (1969). In view of the fact that the petitioners in docket Nos. 2377–68 through 2381–68 failed to file Federal income tax returns for 1960 the statute of limitations can present no bar, because it never commenced to run. Sec.

6501(a). These petitioners, of course, must bear the burden of proof. Rule 32, Tax Court Rules of Practice. Due, however, to the quality and quantity of the evidence presented by the petitioners we need not add further complexities to this case by concerning ourselves with this split burden of proof.

We must first consider the valuation of the transferred assets of Omark 1959. The answers to the three other questions presented are dependent upon our answer to the first.

It is generally accepted that fair market value is "the price at which property would change hands, after negotiation, between a willing buyer and a willing seller, both being informed and neither being under a compulsion to buy or sell." *Portland Manufacturing Co.*, 56 T.C. 58, 79–80 (1971). Furthermore as we stated in *Portland Manufacturing*, when stock is closely held and no contemporaneous sale transactions are available all relevant facts and circumstances may be considered.

At trial the petitioners presented the testimony and written reports of three expert witness. They testified that the fair market value of the assets sold by Omark 1959 was not lower than $720,000 or higher than $900,000 based upon a capitalization-of-earnings test. They testified, in addition, that upon liquidation of Omark 1959 these assets would have brought prices from $820,000 to $960,000. The respondent offered the testimony and written report of one expert who had initially valued the common stock of Omark 1960 at $3,339,000 and the 15,000 shares of preferred at $1,112,000. Adding these amounts he arrived at the fair market value of $4,451,000 for the business transferred from Omark 1959 to Omark 1960. In arriving at this value the respondent's witness relied solely upon a capitalization-of-earnings test.

We will first consider the fair market value placed upon Omark 1959's business assets by the respondent. At trial and on brief the respondent made certain concessions as to his initial valuation; incorporating these concessions into his original method we arrive at a tentative fair market value for the assets transferred by Omark 1959 of $2,678,101.

The base of respondent's valuation procedure is the net after-tax profit of Omark 1959 for its fiscal year ended June 30, 1960; i.e., $361,630. From this amount the respondent would subtract $75,000 as the dividend obligation of Omark 1960 on its preferred stock. To this adjustment we add $71,646 representing amounts not taxable in Canada received by Omark 1959 upon the liquidation of a subsidiary. This $71,646 the respondent conceded on brief represents an item of nonrecurring income, to be eliminated in the determination of net earn-

ings. These adjustments leave net adjusted earnings for 1960 of $214,984. To this figure the respondent would apply an earnings multiple of 10.4. This figure was arrived at by the respondent's witness by reference to sales of Omark stock by Gray during 1959 and 1960. Applying this 10.4 multiple to our adjusted earnings figure we arrive at a product of $2,235,834. To this the respondent would add a premium of 12 percent for the value of control; i.e., a total of $2,504,134 as the value of the common stock of Omark 1960.

At trial the respondent's witness confessed that he had been unaware at the time he performed his valuation that certain important patent and trademark rights (discussed *infra*) would have been unavailable to an unrelated purchaser of Omark 1959. Upon being informed of this he stated that he would diminish his valuation by 25 percent. In so doing he implied that he would reduce his grand total by 25 percent; however it appears to us that he was over hasty, giving the respondent the benefit of the doubt we reduce his valuation of the common stock of Omark 1960 by 25 percent to $1,878,101. To this amount the respondent would add the fair market value of the Omark 1960 preferred stock, stipulated to be $1 million. The amount of $2,878,101 thus represents the fair market value of Omark 1960 as of June 30, 1960. We, however, feel that one further adjustment is necessary. Our concern is not with the fair market value of Omark 1960 but with the fair market value of the assets transferred by Omark 1959. We would therefore reduce the fair market value of Omark 1960 by $200,000, the amount contributed by Omark, leaving $2,678,101 as the fair market value of Omark 1959's assets as of June 30, 1960.

Despite our adjustment of the respondent's valuation we believe the adjusted amount excessive.

The respondent's valuation contains a variety of flaws which taken in sum are fatal. Firstly and perhaps most importantly, we have grave doubts as to the accuracy of the capitalization-of-earnings method when applied to the instant facts. See our opinion in *Portland Manufacturing Co., supra*, in which the respondent opposed use of this method. In addition, assuming the efficacy of the method we have misgivings about the respondent's choice of 10.4 as an appropriate multiplier. This figure represents the price-earnings ratio of Omark, a corporation considerably larger than Omark 1959. A statistical study of Tax Court opinions written during the years from 1949 through June of 1966 indicates that the average multiple used upon the earnings of the most recent year of manufacturing corporations in valuation cases was 6.42. See Corporate Security Values. As Determined By The Tax Court 6 (2d ed. 1966).

More important than any specific objections available to the respondent's application of the capitalization-of-earnings method of

valuation is his failure to take into consideration certain negative factors in the worth of Omark 1959 of which the petitioners have proven the existence by more than a fair preponderance of the evidence. For example in our Findings of Fact we noted that "All export sales made by Omark 1959 through the end of 1960 were solicited and obtained," by Omark personnel. Omark 1959 had no export department or export sales staff of its own. Export sales amount to one-third of Omark 1959's total saw chain sales for its year ended June 30, 1960. At trial the respondent's expert witness stated that if Omark 1959 lost one-third of its sales "the earnings would decline by more than one-third since there are certain fixed expenses." It is patent that upon acquisition by an unrelated purchaser Omark 1959 would have lost these export sales at least temporarily. This factor would clearly have the effect of diminishing the purchase price that such an unrelated purchaser would be willing to pay for the company.

Furthermore Omark 1959 was dependent upon Omark in other material aspects; e.g., corporate organization and administrative structure, product research and development, development of production methods and machinery, patent licensing and prosecution, advertising and sales promotion, training, etc. In addition the loss of the services of Gray would be an important factor to a willing purchaser. Without attempting to place a dollar value on these areas of dependence it cannot be gainsaid that they would present important considerations to any prospective purchaser. We do not mean to imply that Omark 1959 was not a viable business entity, for it was. However, it was, nonetheless important for it to have the support of Omark in the aforementioned areas.

As we detailed in our Findings of Fact the manufacture of saw chain was directly responsible for approximately two-thirds of the sales of Omark 1959 and its subsidiaries. All but a very small percentage of commercial saw chain sold was Cox chipper chain. In order to manufacture this chain the manufacturer would have to have rights under basic patents; i.e., the Merz patents; as well as rights to the improvement of the Merz patents; i.e., the Cox patents. In 1960 Omark 1959 was the owner of the Cox Canadian patents. Omark 1959 did not, however, have in its own right a license under any of the Merz patents, United States or Canadian. Omark 1959 was able to manufacture its most important product, Cox chipper chain, only at the sufferance of Omark. In addition Omark and Omark 1959 marketed Cox chipper chain under the trademark "Oregon." By the end of 1960 Oregon Chipper Chain was considered the best available. Omark 1959's right to use the "Oregon" trademark was by license from Omark subject to termination upon 30 days' written notice.

At trial the respondent's expert witness stated that he had not been made aware of the foregoing facts at the time he performed his valuation of Omark 1959.[10] He was informed of the patent position of Omark 1959 on the eve of trial. At trial he stated that this information would cause him to reduce his valuation by no more than 25 percent. When he was asked by counsel for petitioners what effect the trademark loss would have on his valuation he adhered to his 25-percent reduction. Upon careful consideration of this witness' responses we must conclude that his choice of 25 percent was arbitrary; bearing no relationship to the actual earnings of Omark 1959 attributable to the manufacture of the Cox chipper chain.

The respondent argues on brief that any loss of revenue would be minimized by a sale of the Omark 1959 business to a competitor, with rights under the Merz patents. We find this argument deficient in two respects. Firstly, the licensees under the Merz Canadian patents had no rights to sublicense. Therefore in order to procure the necessary right for Omark 1959 said licensees would have had to negotiate directly with Draper, the owner of the Merz Canadian patent. The petitioners presented ample evidence showing that Draper had granted rights under the Merz patents only to replace preexisting commitments or to obtain a needed cross-license. Draper had, by virtue of an agreement entered into with Omark and Omark 1959, irrevocable, royalty-free, nonexclusive licenses under the Cox patents, both United States and Canadian. There was, therefore, no real incentive for Draper to grant rights under the Merz patents. Perhaps Draper would have been willing to grant such rights for a royalty but it cannot be assumed that any reasonable purchaser would be willing to purchase Omark 1959 on this basis without some major adjustment in the purchase price since the possibility existed that Omark 1959's sales would be diminished by as much as two-thirds.

If we assume *arguendo* that a competitor of Omark would be willing to purchase Omark 1959 and thereafter use its assets in its own manufacturing process this would certainly lead to the conclusion that such a purchaser would be buying the underlying assets of Omark 1959 rather than a going concern.

The second respect in which we find the respondent's argument deficient is that it depends upon a specific competitor's willingness to buy. This seems to us to violate the definition of fair market value; i.e., the willing buyer-willing seller concept. We need not dwell on this point in view of our determination that a competitor of Omark or Omark 1959 would be unwilling to pay the purchase price suggested by the respondent.

---

[10] As we stated above this witness valued the business of Omark 1960, we have translated this into a valuation of Omark 1959, the corporation at issue.

In their arguments that the respondent's valuation was excessive the petitioners contend that we should consider the consolidated earnings of Omark 1959 and its subsidiaries, particularly Canadian Fastening and Montreal Motor Boat. These two corporations were acquired by Omark 1959 in October of 1959 and February of 1960, respectively, and at the time of acquisition had losses unrelated to their sales of saw chain. These losses when combined with the after-tax profits of Omark 1959, significantly reduce the latter corporation's earnings for its fiscal year ended June 30, 1960. The respondent argues that these losses should not be considered, because they were unrelated to the sale of chain and in any case these corporations would soon be rehabilitated by a purchaser of Omark 1959. We do not feel that it is necessary for us to resolve this conflict. Nor is it necessary for us to resolve the parties' disparate requested findings of fact relative to the state of the Canadian economy during the period in issue. The petitioners need not establish [11] the fair market value of the property transferred by Omark 1959 with mathematical precision. All that we require is proof of sufficient quantum that the disputed fair market value did not exceed the consideration given therefor by Omark 1960. As we stated above, by making certain adjustments to the respondent's valuation we arrive at a value of $2,678,101. This amount does not however make any allowance for loss of export sales, loss of cooperation from Omark and Gray; nor does it make sufficient allowance for the patent/trademark position of Omark 1959. Furthermore, the amount is arrived at purely by reference to the capitalization-of-earnings method, using what we consider to be an improper multiplier. We feel it evident and so determine that based upon consideration of all relevant facts and circumstances the fair market value of the assets transferred by Omark 1959 did not exceed $2,816,227,[12] the amount of consideration given by Omark 1960.

Our factual determination as to the fair market value of the assets transferred by Omark 1959 to Omark 1960 has two consequences. First, we need not consider the respondent's arguments advancing his constructive dividend theories. Under his first theory there is no excess fair market value to cause a disproportion in the stock interests of Omark and Omark 1959 in Omark 1960. See sec. 1.351–1(b)(1), Income Tax Regs. Under the respondent's second theory the parity of consideration received to consideration given eliminates the bargain-sale requisite to the application of constructive dividend treatment

---

[11] The petitioners have the burden of proof in docket Nos. 2377–68 through 2381–68. As we stated above the respondent has the burden of proof vis-a-vis the petitioners in docket No. 2376–68.

[12] We attach no significance to the fact that the book value of these assets exceeds their fair market value.

to the controlling shareholder of brother-sister corporations.[13] *PPG Industries, Inc.*, 55 T.C. 928, 1007 (1970).

Secondly, due to the respondent's inability to show an omission in excess of 25 percent of the amount of gross income shown on the return of the petitioners in docket No. 2376-68 we find that the assessment of any deficiency for the taxable year ended December 31, 1960, is barred by the statute of limitations. Sec. 6501(a), (e)(1)(A).

We must now turn our attention to the events which transpired during 1962. Once again the issues are best framed by reference to the factual context in which they arise.

After the transfers of 1960, hereinabove described, the petitioners were the owners of 90.4 percent of the stock of Omark, which, in turn, owned all of the common stock of Omark 1960. The 15,000 shares of Omark 1960 preferred stock were owned by Omark 1959 (petitioners changed the name of this corporation to Yarg, and it will be hereinafter so referred to). It was Gray's intention that Yarg be a real estate investment company in Canada and that it use its liquid assets for that purpose. In pursuance of Gray's plan Yarg employed various agents for the purpose of discovering and/or investigating possible real estate deals in Portland, Toronto, Vancouver, and Winnipeg. In addition, by mid-1962 Yarg had made investments in or loans to several Portland corporations. At various times during 1961 and the first 6 months of 1962 these investments and advances totaled approximately $309,000. In June of 1961 Yarg had received $37,500 (Canadian dollars) in dividends with respect to the preferred stock of Omark 1960.

By the middle of 1962 Gray's tax advisers became concerned about the impending enactment of present section 1248. Early versions of the bill containing that section presented the possibility of ordinary-income treatment to Gray and his family of the proceeds of an eventual liquidation of the Gray interest in Yarg. Therefore, with his attorney's advice, Gray decided to terminate his interest in the corporation. Fearing that the liquidation of Yarg would mean ordinary income to Gray his advisers suggested a sale of the Yarg stock to an unrelated third-party purchaser.

Efforts were made on behalf of Gray to find a purchaser and eventually Gray's attorney, Griswold, was put in contact with Cameron, representing his two wholly owned Canadian investment banking corporations, Cameron and Dabne.

---

[13] Although we do not reach the question we feel constrained to express our doubt that the respondent's arguments would have prevailed had we found a disparity in the consideration received by Omark 1959 for its assets. See *PPG Industries, Inc.,* 55 T.C. 928, 1007 (1970) ; *W. B. Rushing,* 52 T.C. 888 (1969), affd. 441 F. 2d 593 (C.A. 5, 1971). But see *Sammons* v. *United States,* 433 F. 2d 728 (C.A. 5, 1970), affirming an unreported decision (N.D. Texas 1969, 24 A.F.T.R. 2d 69–5804), 69–2 U.S.T.C. par. 9710.

On September 11, 1962, Cameron met with Gray's agents. Following this meeting Cameron prepared a letter which stated that a group of Canadian investors would be caused to purchase all of Yarg stock "for cash in an amount equal to the net book value less 4½ percent of undistributed income." This letter further recited that "Under the terms of an escrow agreement to be drawn, it is understood that we will not be bound to complete the purchase until the Company's [Yarg] assets are shown to be cash and that its only liabilities will be capital and surplus." The Cameron group wanted to complete the transaction by September 27, 1962, in order to avoid any possible changes in the Canadian tax laws.

On September 14, 1962, Yarg "sold" its stock and loan investments, with the exception of the 15,000 shares of Omark 1960 preferred, to Gray at book value. Thereafter Yarg's assets were comprised of cash and 15,000 shares of Omark 1960 preferred. It had no outstanding liabilities.

On September 21, 1962, Gray's agents met with Cameron and others at a bank in Vancouver. Gray's agents delivered the Yarg stock, properly endorsed, along with Yarg's books and records, to Cameron. Cameron delivered to Griswold two certified checks payable to petitioners each in the amount of $840,700 (Canadian dollars). Thereafter the parties entered into an escrow agreement. Gray's agent delivered the two checks for $840,700 (Canadian dollars) and Cameron delivered all of the assets of Yarg. In essence the agreement gave Cameron the option to rescind the contract of "sale" if $1,500,000 (Canadian dollars), as the proceeds of the redemption of the Omark 1960 preferred stock, was not received by the escrow agent for by 12 noon on September 26.

Gray agreed to indemnify Yarg with respect to any debts, liabilities, and contracts up to 2 p.m., September 21. Cameron agreed that Yarg was not entitled to receive any dividends from Omark 1960 as of September 15, 1962. Gray was assured by Cameron's attorney that Yarg would earn no income until after June 30, 1963.

By letter dated September 22, 1962, furnished by one of Gray's attorneys and signed on behalf of Yarg by Cameron's attorney, redemption of 15,000 shares of Omark 1960 was requested. Omark 1960's board of directors authorized redemption at a meeting on September 25. Omark 1960 transmitted its check for $1,500,000 (Canadian dollars) to the escrow agent. The agent then transmitted the stock certificate to Omark 1960 for cancellation, the checks for $840,700 to the Grays, and the Yarg assets to Cameron. Most of the funds used by Omark 1960 to redeem its stock came from loans arranged on September 17, 1962, from Omark and Omark International Ltd. (Amster-

dam). Nine hundred thousand dollars ($900,000) was borrowed by Omark from banks in Portland.

It is the respondent's contention that the above transaction was not merely a sale of the Yarg stock by the petitioners to Cameron and Dabne, but was rather a constructive dividend of the assets of Yarg followed by a dividend upon the redemption of the Omark 1960 preferred stock. The respondent argues that there was no sale on September 21, 1962—that petitioners were the owners of the Yarg common stock. From this the respondent deduces that the petitioners took the corporate property of Yarg in consummating the sale and that the taking of the Yarg property was a constructive distribution of property taxable as a dividend. Further, the respondent argues that since the petitioners were the owners of the Omark 1960 preferred stock on September 25, 1962, the day it was redeemed, the redemption failed to meet the tests provided by section 302 and was essentially equivalent to a dividend, hence taxable under section 301.

The petitioners argue that the sale of Yarg stock was complete on September 21, 1962, that the assets of Yarg were placed in escrow by Cameron, and that the stock was redeemed by Omark 1960 from Yarg.

Our view of the events of September 21, 1962, leads to a conclusion which differs from those advanced by the parties. The petitioners did not receive a distribution of the assets of Yarg taxable as a dividend, nor was there, for Federal income tax purposes, a completed sale of the Yarg stock to Cameron and Dabne although we may assume (as petitioners would have us do) that a completed sale had occurred under the law of Canada. It is our determination that though in form there was a purchase and sale in substance the petitioners received the assets of Yarg in a distribution upon liquidation. We accept the petitioners' contention that a transaction was finalized on September 21, but what was finalized was a liquidation, not a sale.

It is now well established that the incidence of taxation depends upon the substance of a transaction not the mere form, where the form is not imbued with economic reality. *Commissioner* v. *Court Holding Co.*, 324 U.S. 331 (1945); *Higgins* v. *Smith*, 308 U.S. 473 (1940); *Gregory* v. *Helvering*, 293 U.S. 465 (1935). "[T]axation is not so much concerned with the refinements of title as it is with actual command over the property taxed—the actual benefit for which the tax is paid." *Corliss* v. *Bowers*, 281 U.S. 376, 378 (1930). "[A]nd it makes no difference that 'command' may be exercised through specific retention of legal title or the creation of a new equitable but controlled interest, or the maintenance of effective benefit through the interposition of a subservient agency." *Griffiths* v. *Commissioner*, 308 U.S. 355, 357–358 (1939).

"Tax consequences are determined by the substance of a transaction rather than by the means employed to transfer legal title." *Virginia W. Stettinius Dudley*, 32 T.C. 564, 585 (1959), affirmed per curiam 279 F. 2d 219 (C.A. 2, 1960). The petitioners are free to minimize their taxes within the framework of the law, *Ragland Investment Co.*, 52 T.C. 867, 878 (1969), affirmed per curiam 435 F. 2d 118 (C.A. 6, 1970). However this freedom is limited in that the course of action embarked on must have some economic reality other than the avoidance of tax. *Gregory v. Helvering, supra* at 469.

Given the black-letter law proposition that substance is preeminent over form it becomes our task to determine the substance of the transactions at issue and then to let the chips of tax consequence fall where they may. As we stated above the petitioners received a distribution in liquidation of the assets of Yarg and then caused the redemption of the Omark 1960 preferred stock received upon liquidation. As of September 26, 1962, the petitioners were possessed of some of the assets of Yarg in kind in addition to cash in the amount of the net book value of Yarg's assets less the book value of those assets retained in kind.[14] In order to place any credence on the petitioners' contentions that the form of the transactions at issue reflects reality one must be able to accept the premise that Cameron and Dabne were more than a strawman, a conduit, an agent of the petitioners. This we cannot do. Cameron and Dabne bought cash encased in a corporate shell. The net effect of their machinations was that they transferred $1,681,400 (Canadian dollars) in cash in exchange for $1,761,397 (Canadian dollars) in cash.[15] Cameron and Dabne purchased nothing; they rather performed services for a fee of $79,997 ($1,761,397 less $1,681,400).[16] Gray attempted to use these investment banking corporations as filters, to separate the elixir of capital gain from the dross of dividend.

In support of this conclusion we note several salient facts. Firstly, Cameron bargained for an exchange of cash and he got exactly what he bargained for. Secondly, the "profit" of Cameron and Dabne was predetermined at 4½ percent of the net value of Yarg's assets, the so-called bargain and sale does not appear dependent on the fair market value of the Yarg stock; indeed it could not, because the Yarg stock was tantamount to a bank deposit book. Thirdly, there can be no

---

[14] The amount of cash received by petitioners was equal to the above-mentioned amount less $79,997 (Canadian dollars) which was the fee exacted by Cameron and Dabne (discussed *infra*).

[15] After the redemption of the Omark 1960 preferred Cameron and Dabne received $1,500,000 (Canadian dollars) in addition to the $261,397 (Canadian dollars) of Yarg that was already in escrow.

[16] The excess amount received by Cameron and Dabne represents their fee for participating in the dissolution of Yarg and the redemption of the Omark 1960 preferred stock. Therefore the amount paid therein must be allocated to the proceeds received on liquidation and redemption.

suggestion that Cameron and Dabne bought a viable corporation even though we have accepted as a fact that Gray originally intended to make and use Yarg as a viable entity. We think it a fair inference that Yarg had no employees; Griswold was able to bring the entire corporation to Vancouver in a brief case. As of September 21, 1962, Yarg's investment activities had come to an end. All that remained of its investments was the 15,000 shares of Omark 1960 preferred stock and this was, shortly, to be distributed to Gray through Cameron and Dabne. As if to emphasize Yarg's complete passivity Cameron had agreed that no further dividends on the preferred stock would be expected. Fourth, there is the fact that the Grays were assured by the "purchasers" that Yarg would earn no profits until after June 30, 1963. Cameron and Dabne merely agreed to act as the repository of this corporate purse for a time. Finally, although Cameron provided the Grays with two certified checks for $840,700, these checks were immediately placed in escrow so that prior to the time payment would have to be made Cameron and Dabne were, for all practical purposes, already in receipt of $1,500,000 (Canadian dollars), the proceeds of the redemption of the Omark 1960 preferred stock. We note the petitioners' protestations that Cameron's and Dabne's checks were certified, but this does not alter the fact that they were never out-of-pocket as much as one dollar. As further support for our finding of the subservient nature of Cameron's and Dabne's role we note that the letter requesting redemption by Omark 1960 was drafted by Gray's agent. When one purports to sell cash in corporate solution the burden is surely particularly severe on the seller to show that the only purpose served is not tax avoidance.

Once the fog of Cameron and Dabne is blown away by the fresh air of economic reality the substance of the transactions is clearly visible. On September 26, 1962, the petitioners, collectively, had $1,681,400 (Canadian dollars) in cash and Gray had Yarg's investments in Molded, Sunset Science Park, and Northwest Science Investment in kind. The question now to be answered is how did this cash and these assets come to rest with petitioners.

In view of Gray's intent to terminate the petitioners' interest in Yarg the only plausible explanation is that Yarg was liquidated, the petitioners received its assets, and then Omark 1960 redeemed its preferred stock from the petitioners. The term "liquidation" is not defined by either the Code or the regulations. The question of whether a liquidation has occurred is one of fact. "In deciding this factual issue, the inquiry is not whether the corporation was formally dissolved under State law." *William C. Kind*, 54 T.C. 600, 605 (1970). Our conclusion that what purported to be a sale was in fact a liquidation finds

considerable support from the fact that, at the conclusion of the various transactions the petitioners had in hand the precise assets formerly held by Yarg although the Omark 1960 preferred stock was to be redeemed for cash, hardly an undesirable exchange. We attach no significance to the fact that Gray purportedly purchased Yarg's investments in Molded, Sunset Science Park, and Northwest Science Investment. He must have known that he would receive the return of his purchase price in short order upon the complete liquidation of Yarg. As of September 21, 1962, the distribution in liquidation was complete. Through his agents, including Cameron and Dabne, Gray obtained complete dominion and control of all the assets of Yarg; at this time composed of cash and the Omark 1960 preferred stock.

It is at this point that the respondent would have us hold that a constructive distribution of property, taxable as a dividend, occurred. However, we are firmly convinced this was not a constructive dividend, but, an actual distribution precedent to the termination of all Yarg activities. It is not as though a distribution of the earnings and profits of a going corporation occurred, but, rather, all of the assets of a corporation were distributed. In this regard we find the cases cited by respondent distinguishable.[17]

Our holding that the petitioners received 15,000 shares of Omark 1960 preferred upon the liquidation of Yarg necessitates consideration of how the redemption of those shares is to be treated for Federal income tax purposes. Our determination that Cameron and Dabne were merely agents of the petitioners for purposes of the liquidation of Yarg applies equally to their impact upon the redemption of the preferred stock. In reality this stock was redeemed from the petitioners.

Distribution by a corporation to a shareholder with respect to its stock out of earnings and profits are dividends taxable under section 301(c) unless the Code otherwise provides. Secs. 301 (a) and (c), and 316(a). Section 302(a) provides that if its requisites are met a redemption of stock shall be treated as a distribution in part or full payment in exchange for the stock. Section 302(b) contains four tests and if any of the four are complied with the redemption will be treated as an exchange under the general rule of section 302(a). These tests may be summarized as follows: (1) Where the redemption is not "essentially equivalent to a dividend." (Sec. 302(b)(1)). (2) The taxpayer's voting strength is substantially diminished. (Sec. 302(b)(2)). (3) His interest in the company is completely terminated. (Sec. 302(b)(3)). (4) Certain railroad stock is redeemed. (Sec. 302(b)(4)). *United States* v. *Davis*, 397 U.S. 301, 305 (1970). Petitioners do not contend

---

[17] *Commissioner* v. *Makransky*, 321 F. 2d 598 (C.A. 3, 1963); *Byers* v. *Commissioner*, 199 F. 2d 273 (C.A. 8, 1952); *Harry L. Epstein*, 53 T.C. 459 (1969); *Irving Sachs*, 32 T.C. 815 (1959).

that they come within the terms of the latter three mechanical tests. Indeed our examination of the statute indicates that such an argument would be futile.

Having failed to meet any of the automatic tests contained in section 302(b)(2) through (4), we must now determine whether the redemption was not essentially equivalent to a dividend under section 302(b)(1). The fundamental test of dividend equivalency is whether the distribution was pro rata or proportionate to the taxpayer's stockholdings. *United States* v. *Davis, supra* at 306. In determining stock ownership for purposes of section 302(b)(1) the attribution rules of section 318(a) are applicable. *United States* v. *Davis, supra* at 306–307. Therefore as we stated above, without reference to the family-attribution rules of section 318(a)(1),[18] the petitioners are deemed to have owned the following percentages of Omark 1960's common stock:

| Petitioner | Omark 1960 (percent) |
|---|---|
| Gray | [1] 55. 4 |
| Mrs. Gray | 10 |
| Children: | |
| John R. | 5 |
| Joan | 5 |
| Janet | 5 |
| Laurie | 5 |
| Anne | 5 |

[1] In April of 1957 Gray owned 65 percent of Omark's common stock; by September of 1960 Gray had sold 9.6 percent of Omark's stock from his holdings, leaving him 55.4 percent.

Upon liquidation of Yarg the petitioners received the following percentages of the preferred stock of Omark 1960:

| Petitioner | Omark 1960 preferred (percent) |
|---|---|
| Gray | 60 |
| Mrs. Gray | 10 |
| Children: | |
| John R. | 6 |
| Joan | 6 |
| Janet | 6 |
| Laurie | 6 |
| Anne | 6 |

And, of course it follows, that upon the redemption of the preferred stock the petitioners would each receive a distribution in accordance with the above percentages. It is our determination that the slight

[18] Application of sec. 318(a)(1) would present complexities in that the total of petitioners' stockholdings would exceed 100 percent. In this regard *United States* v. *Davis*, 397 U.S. 301 (1970), is distinguishable. In *Davis* the taxpayer owned all of the preferred stock in question. The distribution there involved did not go to the members of his family who held 87.5 percent of the common stock in question. The Supreme Court held that Davis was the constructive owner of 87.5 percent and actual owner of 12.5 percent.

disparity between the petitioners' holdings in Omark 1960's common stock and the amounts of the distributions received are too insubstantial to render the distributions non-pro rata or disproportionate. Exact parity is not required.

In *Davis, supra* at 310–311, fn. 10 and accompanying text, the Supreme Court stated that section 302(b)(1) was added to mitigate the harsh result of section 302 when preferred stock was called by the corporation without the control of the shareholder. See also S. Rept. No. 1622, 83d Cong., 2d Sess., p. 44 (1954); Bittker & Eustice, Federal Taxation of Corporations and Shareholders, sec. 7.24, p. 291 (2d ed. 1966). The instant case certainly cannot come within the immunization provided by the Congress. Gray, and the other petitioners constructively, were virtually on all sides of the transaction at issue. Not only did he cause the distribution of the Omark 1960 preferred stock, and its subsequent redemption, but he caused Omark to make a substantial part of the funds for redemption available to Omark 1960 prior to the ostensible sale to Cameron and Dabne. In this regard we find the cases of *Stanley D. Beard*, 4 T.C. 756 (1945), *W. P. Hobby*, 2 T.C. 980 (1943), and *Clara M. Tully Trust*, 1 T.C. 611 (1943), upon which petitioners rely, distinguishable.

Having failed to meet the requirements of section 302(b) and therefore subsection (a), the petitioners come within the terms of section 302(d), which section provides that the distribution received in redemption of the Omark 1960 preferred stock "shall be treated as a distribution of property to which section 301 applies."

In answering the respondent's arguments concerning substance over form the petitioners have cited us to several cases in which the form of the transactions then in question was held to govern the tax consequences.[19] Upon careful consideration we do not find that any of these cases are controlling here. Without unduly prolonging this already lengthy opinion we note that each case of this genre must be decided on its own facts and circumstances. In the cases cited by petitioners the questioned transactions were endowed with the economic reality that the ostensible sale to Cameron and Dabne lacks. In *Stanley D. Beard, supra* at 757–758, *W. P. Hobby, supra* at 985, and *Clara M. Tully Trust, supra* at 621, there were final and completed sales, without restrictions. In addition, the selling shareholder was not in control of the redeeming corporation. In the case at bar, while the "sale" may have been final under Canadian law it can hardly be said

---

[19] E.g., *United States* v. *Cumberland Public Service Co.*, 338 U.S. 451 (1950); *Peter Pan Seafoods, Inc.* v. *United States*, 417 F. 2d 670 (C.A. 9, 1969), reversing 272 F. Supp. 888 (W.D. Wash. 1967); *Stanley D. Beard*, 4 T.C. 756 (1945); *W. P. Hobby*, 2 T.C. 980 (1943); and *Clara M. Tully Trust*, 1 T.C. 611 (1943).

to be unrestricted. Furthermore, as we stated above, Gray was firmly in control of virtually all events. On our facts we would be hard pressed to say that the "sale" consummated was of the sort contemplated when section 1222 was enacted.

In *United States* v. *Cumberland Public Service Co.*, 338 U.S. 451 (1950), the Supreme Court affirmed the Court of Claims which had found that the sale in question there was made by the shareholders rather than the corporation (a la *Commissioner* v. *Court Holding Co.*, *supra*). In essence the Supreme Court was affirming a factual determination; i.e., that a corporation was liquidated and that its shareholders sold certain assets. In our case we have determined that in reality no sale occurred. *United States* v. *Cumberland Public Service Co.* is inapposite.

In *Peter Pan Seafoods, Inc.* v. *United States*, 417 F. 2d 670, 673 (C.A. 9, 1969), reversing 272 F. Supp. 888 (W.D. Wash. 1967), the Court of Appeals stated that: "Where a transaction has economic substance and is economically realistic, it should be recognized for tax purposes." We agree with this statement without reservation and have applied the concept to the instant facts. However, as we stated above the "sale" to Cameron and Dabne lacked the requisite economic reality. What purported to be a sale followed by a redemption from the purchasers was in reality a dissolution and redemption from the petitioners. We might note here that in view of our holding in this regard it is unnecessary for us to consider the respondent's alternative argument concerning section 306.

At trial the respondent sought leave to amend his answer in order to conform his pleadings to the proof. This was necessitated by the parties' stipulation that the 15,000 shares of Omark 1960 preferred stock had at all relevant times a fair market value of $1 million (Canadian dollars). Without objection by the petitioners said leave was granted. The amendment arithmetically caused an increase in the deficiencies asserted for 1962. On brief the petitioners now argue that this amendment constitutes "new matter" and that therefore under Rule 32, Tax Court Rules of Practice, the respondent has the burden of proof. Without considering the substantive merits of the petitioners' argument it is our determination that, assuming *arguendo*, the burden of proof is on the respondent, it is clear that it has been carried.

*Decisions will be entered under Rule 50.*