JACOB H. ROBBINS and ANNE ROBBINS, Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Robbins v. Commissioner
Docket No. 6652-80.
United States Tax Court
T.C. Memo 1982-565; 1982 Tax Ct. Memo LEXIS 183; 44 T.C.M. (CCH) 1254; T.C.M. (RIA) 82565; September 27, 1982. Donald J. Forman and Howard A. Weinberger, for the petitioners. Donald W. Hicks, Sr., for the respondent. SCOTT MEMORANDUM FINDINGS OF FACT AND OPINION SCOTT, Judge: Respondent determined a deficiency in petitioners' income tax for the calendar year 1977 in the amount of $5,150. The only issue for decision is whether petitioners are entitled to deduct as a medical expense in the year 1977 an amount of $20,000, or any portion thereof, because of purchase by them in that year of a residence which had an enclosed swimming pool on the premises. FINDINGS OF FACT Some of the facts have been stipulated and are found accordingly. Petitioners, husband and wife, who resided in Dallas, Texas, at the time of the filing of their petition in this case, filed a joint Federal income tax return *184 for the calendar year 1977. Jacob H. Robbins (petitioner) is a physician who, during the year 1977 and for some years prior thereto, was engaged in the practice of family medicine in the area of North Dallas. The North Dallas office of petitioner was located approximately 2 miles from the residence in which petitioners lived from 1973 through August of 1977 and approximately 3 miles from the residence which they purchased in September 1977 and lived in from that time to the time of the trial in this case in the fall of 1981. During 1977, petitioner employed another doctor to work with him out of his North Dallas office on a full-time basis, and at the time of the trial of this case this doctor was in partnership with petitioner. In July 1973, petitioner was admitted to Presbyterian Hospital in Dallas, Texas, for back surgery. In September 1973, he was involved in an automobile accident which further aggravated his back condition and he was unable to return to the practice of medicine until October 8, 1973, and thereafter for some time practiced on a part-time basis. Subsequent to 1973, petitioner continued to suffer from back problems and had several operations on his back. *185 On July 23, 1976, petitioner was hospitalized with a heart attack and remained in the hospital until august 13, 1976. He did not return to work until December 1976 and then practiced medicine only on a part-time basis for some period of time. After his release from the hospital petitioner was engaged in a program of cardiac rehabilitation supervised by the Dallas Cardiac Rehabilitation Center. He was encouraged to obtain regular exercise, which should consist of walking, jogging, bicycle riding or swimming. Because of his back condition, petitioner was unable to tolerate brisk walking, jogging or bicycle riding and therefore found it necessary to obtain his exercise through swimming. At first, his swimming exercises were supervised by the Dallas Cardiac Rehabilitation Center at the YMCA pool located in North Dallas. However, swimming in this pool was not completely satisfactory because, on occasion, it was crowded or over-chlorinated and petitioner was unable to exercise at a level sufficient to assist his cardiac condition. At this time, in 1976, petitioners were living in a duplex in North Dallas where they had been living from sometime in 1973. This duplex was approximately *186 2 miles from the residence petitioner purchased in September 1977. In 1977, petitioners were paying $495 a month rental on the duplex, but had been informed that the landlord was going to increase the rent on the property. Petitioners were very comfortably located in the duplex. Most of petitioner's professional associates lived in the North Dallas area, and not only was his office located in that area but most of his patients lived in that area. He practiced at the Presbyterian Hospital in the North Dallas area. For all of these reasons, petitioners wished to continue living in the North Dallas area. Also they considered this area convenient to shopping and to be a desirable residential area. Regular access to a swimming pool throughout the year is medically necessary for petitioner. Petitioners had discussed with the landlord of their duplex the building of a year-round swimming pool at the duplex and had also investigated other pools which Dr. Robbins might use instead of the pool at the YMCA, but had not found another suitable year-round facility in August 1977. Mrs. Robbins saw an ad in the August 21, 1977, Dallas Morning News under houses for lease which stated: *187 NORTH Spacious 4 bdrm with enclosed heated pool year round, near shopping and bus. Best section available immediately $575 with or without option to buy. All schools near. 361-1481. This advertisement was for the house which petitioners subsequently purchased. Petitioners went to inspect the house. They were interested in a house that had a year-round swimming pool available. When petitioners went to inspect the house the owner, Mrs. Bruill Moore, stated that she would like for them to consider purchasing rather than leasing the house, and advised them that they could purchase the house for a monthly payment of $510 as opposed to a rental payment of $575. After receiving this information, petitioners decided to purchase the house. They felt that the monthly payment was not appreciably more than the rent they were paying for the duplex in which they were living and that they could afford the monthly payment. Petitioners purchased the house on September 8, 1977, from DeVere and Bruill Moore. Mrs. Moore was a licensed Texas real estate agent associated with Artha Garza Realtors, which realtors listed the property which petitioners purchased prior to and during 1977. However, *188 the final and actual sales transaction between the Moores and petitioners was arranged without Artha Garza's offices and without the payment of the real estate broker's fee. Mrs. Moore, individually, handled the initial sales transaction. After deciding they were interested in purchasing the house, petitioners turned over to an attorney the negotiations of a purchase price and terms. They also had a person engaged in the house repair business inspect the house. This individual looked at the foundation, the roof, and the house in general. The attorney negotiated a purchase contract for petitioners for the house. The total purchase price of the house was $77,000. Petitioners paid $3,500 immediately and agreed to pay $1,500 within 90 days. The $72,000 balance was to be by way of a note given by petitioners to the sellers, with interest only to be paid. The note did not specifically recite that the payment was interest only or when payment of the principal was due. However, the stated interest rate of 8-1/2 percent and the monthly payment of $510 shows that only interest was being paid. Petitioners understood that the interest only payment was to last for a 2-year period. *189 On October 18, 1979, petitioners received a letter from an attorney representing Mr. and Mrs. Moore in regard to the note they had given to the Moores. This letter stated in part as follows: On September 8, 1977, you executed a Promissory Note (the "Note") in the original principal amount of Seventy-Two Thousand Dollars ($72,000.00). Said Note was to bear interest at the rate of eight and one-half percent (8-1/2%) per annum. Interest only was to be payable for the first two years with the first payment being due on November 15, 1977 and the final payment being due on October 15, 1979; and all principal plus accrued interest was to be payable on October 15, 1979. As no date of final payment was actually included therein, the Note is and has at all times been a demand note. Therefore, at this time, payees, DeVere E. Moore and wife, Bruill A. Moore, made demand upon you for payment in full of the above described Note plus any and all accrued interest. After receiving the letter from the Moores' attorney, petitioners contacted their attorney. Petitioners' attorney made arrangements with the Moores to extend the period of time for payment in full for an immediate payment of *190 an additional $5,000 in cash. After paying the $5,000 in cash, petitioners obtained a mortgage loan on the house for $67,000 and paid the Moores in full. [1]
The house petitioners purchased was built in the mid-1950's. It contained *191 2,734 square feet and a lot which contained approximately one-half acre of land. The house is of the type that is sometimes referred to as a "tract" house in that a number of homes were built in the vicinity at approximately the same time. In the back of the house is a covered swimming pool. The swimming pool had been built at approximately the same time as the house. However, the enclosure covering the pool had been built in 1976 and completed late in that year. The house has four bedrooms, two full baths and another bath that has a toilet and shower but no washbasin. The square footage of the house includes a gameroom. Initially there had been a garage with the house, but the garage had been converted into the gameroom, so the house purchased by Dr. and Mrs. Robbins did not have a garage or a carport. After purchasing the house and moving into it, Dr. Robbins has been swimming in the pool almost every day of the year. He engages in a typical workout which includes 15 to 20 minutes of steady swimming of laps. This exercise is medically necessary for Dr. Robbins. The swimming pool is a relatively large pool with steps at one end and a diving board at the other end. It *192 has a ladder also. The enclosure of the pool had glass windows, but the ventilation was not sufficient to keep the enclosure from getting hot and humid in the summertime. The house had a concrete patio, but there was no patio or lounging area directly around the pool. When petitioners purchased the house, they found some minor items that, in their opinion, needed repairs and made some repairs to the house. Between 3-1/2 and 4 years after purchasing the house, petitioners brought certain new kitchen appliances and changed a heater in one of the bathrooms. The following schedule shows 21 different properties that were sold in the general area of the house purchased by petitioners during the year 1976 and the first 7 months of 1977: Square
Year
Sales
Price per
Sale
Address
Footage
Built
Price
Square Foot
Date
1
4942 Crooked
2937
1955
$110,000
$37.45
1/77
2
4610 N. Lindhurst
3039
1955
117,500
38.66
1/77
3
6948 Lavendale
3088
1957
95,000
30.76
1/77
4
5815 Walnut Hill
2638
1955
67,000
25.40
10/76
5
10621 Royal Springs
2582
1955
69,500
26.92
5/77
6
6914 Currin Dr.
2812
1952
65,500
23.29
5/77
7
4140 Northview
3030
1959
78,500
29.91
4/77
8
11507 Royalshire
3085
1957
67,500
21.88
7/77
9
6939 Azalca
2844
1952
63,500
22.33
6/77
10
11325 Chicot Dr.
2369
1955
94,000
39.68
6/77
11
6333 royal Crest Dr.
2785
1953
88,000
31.67
6/76
12
6806 Royal Ln.
2489
1952
53,000
21.29
6/77
13
7506 North Haven
2577
1954
68,500
26.58
8/77
14
5230 Del Roy
2777
1959
$59,500
$21.43
3/77
15
11232 Snowwhite Dr.
2466
1955
60,000
24.33
3/77
16
7138 Lavendale
2848
1954
89,500
31.40
5/77
17
6170 Yorkshire Dr.
3030
1951
65,000
21.45
6/77
18
6541 Azalea Ln.
2519
1955
65,000
25.80
6/77
19
6822 Orchid Ln.
2787
1953
88,700
31.83
7/77
20
7238 Currin Dr.
2850
1954
70,000
24.56
6/77
21
11436 Royalshire
3128
1954
74,000
23.66
6/77
*193 All of these homes were within a radius of approximately 2-3/4 miles of the home petitioners purchased and would be considered to be in the same general North Dallas neighborhood. The first 13 of the properties listed had swimming pools on the property, and the last 8 did not. The properties closest to petitioners' house were 11507 Royalshire, 6170 Yorkshire Drive, 6333 Royal Crest Drive, and 11436 Royalshire. The property at 11507 Royalshire had no garage and the pool on the property was not enclosed. As in the case of petitioners' property, the original garage on this property had been converted into a game room. The house on this property is of a very unusual triangular shape. The house has three bedrooms and is on an approximate half acre lot. The individuals who purchased the property in July 1977 did certain cosmetic work to the property but no substantial type changes were made in it after they purchased it. The property at 6333 Royal Crest Drive has more custom features than the house petitioners purchased and was somewhat superior in construction. The house at 6170 Yorkshire Drive had no swimming pool but did have a garage. In obtaining the square footage of *194 this property, the total square footage of the living space was used and to this was added one-half the square footage of the garage. Some cosmetic work had also been done to this house by the purchasers in June 1977. This house was on approximately the same size lot as petitioners' house. It was a three-bedroom house. The house at 11436 Royalshire had three bedrooms and a garage but the lot was larger than the lot of the house petitioners purchased. The lot was nearer an acre than one-half an acre. This house also had a garage which was counted into the square footage in the same manner as the garage of the house at 6170 Yorkshire Drive. The garage on this property was 23 by 27 feet and was of an irregular shape. The house other than the garage was almost a rectangular shape. The house at 6170 Yorkshire Drive had a somewhat more irregular shape than petitioners' house. Petitioners' house was rectangular except that the game room formed an L with the rectangular part of the house. From December 29, 1976, through March 31, 1977, the multiple listing service in which the house petitioners bought at 11467 Royalshire was listed showed the price of the house at $67,500. The *195 description showed that the house had a 32-by-17.6-foot living room, a 12.6-by-10.6-foot dining room, a 19-by-8.6-foot kitchen with a dining area in the kitchen, a 19-by-15.6-foot den or playroom, and four bedrooms ranging in size from 15.2 by 12.6 feet to 11 by 11 feet. This advertisement showed a pool of 40 by 20 feet and under remarks stated "Complete new custom kitchen, new carpets, updated baths, redecorated & ready to be moved into. Trees corner." In the multiple listing service for the period July 1, 1977, through September 30, 1977, the house which petitioners purchased at 11467 Royalshire was listed at a price of $79,900. The description of the rooms and bedrooms was the same as that in the prior listing. This listing, however, did not show the size of the pool but stated "Year round swimming in large enclosed pool." This listing also referred to a new custom kitchen, remodeled bath with new fixtures, much storage, many closets, gas grill, gas light, and many trees. Both listings referred to a sprinkler system, the earlier advertisement stating "Sprinkler-front & side." Petitioners on their Federal income tax return for the year 1976 deducted as a medical expense $20,000 *196 described as the acquisition of a swimming pool. Respondent in his notice of deficiency disallowed this claimed deduction with the following explanation: The claimed deduction of $20,000.00 for medical expense is not allowed because the value of the property must be increased by the capital improvements. The swimming pool is a part of the total purchase price and is not considered as an improvement. Accordingly, taxable income is increased $20,000.00. On brief, petitioners stated that they now limit their claimed medical expense deduction to $16,100 since a witness offered on their behalf stated that in his opinion the fair market value of the house at the time it was purchased by petitioners was $60,900. OPINION Petitioners in this case take the position that the sole reason Dr. and Mrs. Robbins purchased the home on Royalshire Drive was in order to obtain a swimming pool for Dr. Robbins. They initially took the position that to have built a pool comparable to the pool on the property would have cost $20,000 and therefore they should be entitled to a deduction for what it would have cost them to build a pool on property that did not have a pool. At trial, they contended *197 that they paid more than the fair market value for the property in order to obtain the pool and that they should be entitled to deduct the excess they paid over the fair market value of the property in order to obtain the pool as a medical expense. On brief, they contend that they paid $16,100 in excess of the fair market value of the property purely in order to obtain the pool. Respondent contends that the record fails to show that the reason for petitioners' purchase of the property on Royalshire Drive was to obtain the pool. He argues that there were a number of other reasons for their purchase of this property. Secondly, respondent contends that there is no provision in the statute or regulations for allowing the cost of an improvement that is already on property to be deducted as a medical expense. Respondent points out that section 1.213-1(e)(1)(iii), Income Tax Regs., [2] provides merely that a capital expenditure for a permanent improvement or betterment of property which ordinarily would not be a medical expense may qualify as a medical expense to the extent *198 the expenditure exceeds the increase in the value of the related property if the expenditure is made for medical reasons. Finally, respondent contends that petitioners have failed to show that the amount they paid for the home they bought on Royalshire Drive was in excess of the fair market value of the property. *199 This Court and other courts have held in accordance with the provision now contained in respondent's regulations that, where a permanent improvement is made to a taxpayer's property, the cost of the improvement may be deducted to the extent that the improvement does not increase the fair market value of the property. Oliver v. Commissioner,364 F.2d 575, 578 (8th Cir. 1966), affg. a Memorandum Opinion of this Court; Gerard v. Commissioner,37 T.C. 826, 829 (1962). Respondent contends that the situation here is substantially different from the situation in the Oliver and Gerard cases and other cases with a similar holding in that those cases all involved a capital improvement made for the sole purpose of medical care of the taxpayer whereas here the purchase of the house is for other reasons personal to petitioners as well as for medical reasons. Respondent contends that there is a distinction between the purchase by a taxpayer of a house that already contains a medically needed improvement and the addition of such an improvement to a house already *200 owned by the taxpayer. In our view, the record is clear that the particular house with which we are concerned was purchased by petitioners because it had an enclosed year-round pool. However, the record is not equally clear that there were not other reasons for petitioners' purchasing the house. [3] Also, it is clear that the facility needed for Dr. Robbins' health care was completely on the property at the time petitioners purchased it and that they made no capital improvement with respect to the pool after the property was purchased. We need not decide the merits of the first two contentions made by respondent since, in our view, petitioners have totally failed to show that the amount they paid for the property they purchased was in excess of its fair market value. [4]
*201 In our view, petitioners have failed to show that they paid any amount in excess of fair market value for the house they purchased. The record shows that petitioners answered an advertisement for a rental with option to buy and when they talked to the owner of the house, she suggested that they purchase the house. The record shows that at this juncture petitioners turned the negotiation of the purchase of the house over to a lawyer. Dr. Robbins testified that he did not know how the $77,000 price was arrived at and was not even aware that the list price of the house was $79,900 when he was considering buying it. His testimony was that the lawyer made all these arrangements. The record does not show that petitioners were under any compelling reason to purchase this house. They could have continued to live in the rented duplex with Dr. Robbins using the YMCA pool. Dr. Robbins testified as to his poor financial condition and that his credit rating was not as good as it might have been had he not previously been through a bankruptcy proceeding. However, there is nothing in the record to indicate that the sellers of the house were aware of these facts. Also, the record is barren *202 of any evidence that Dr. Robbins could not have bought numerous other houses either with swimming pools or with space for a swimming pool to be added. The record does indicate that petitioners wanted this house because the year-round swimming pool was already on the property. However, the fact that an individual wants a particular piece of property does not keep that individual from being a willing buyer. Also, the evidence indicates that petitioners were informed buyers as they had a lawyer negotiate the price of the house and had it inspected for possible defects. The Moores were willing and informed sellers. The definition of fair market value has long been recognized to be the price at which property will change hands between an informed willing buyer and willing seller, neither being under any compulsion to buy or sell. Gray v. Commissioner,56 T.C. 1032, 1060 (1971). Generally there is no better evidence of the fair market value of a piece of property than the amount at which it actually changes hands in other than some form of forced sale. In using comparatives *203 to ascertain the fair market value of property that has not actually been sold in an arm's length transaction, experts generally use the price at which other reasonably comparable property changes hands. Unless there is some family or business relationship between the buyer and seller or some other circumstance which would indicate that the price was not a negotiated price, the selling price of the various properties is used as indicative of their fair market value. Here, the price of the house petitioners bought was negotiated for they by their attorney and the record is completely clear that there was no personal or business relationship between the Moores and petitioners that would have affected the price at which the house changed hands. Under the circumstances here present, it would take strong proof indeed to show that the amount paid by petitioners to the Moores for the house they purchased was not the fair market value of the house. In attempting to show that they paid in excess of the fair market value for the house, petitioners offered the testimony of a real estate salesman. This real estate salesman found three sales of property within a block of the house petitioners *204 bought which has sold within 3 months of the date petitioners purchased their house. Only one of these had a swimming pool and, for that reason, this witness used the square footage price of that house to apply to the square footage of petitioners' house to arrive at an amount he considered the fair market value of petitioners' house. The record shows that the sales price of the house that this witness used as a comparable occurred about six weeks prior to the time petitioners purchased their house. Its sales price was $67,500. However, the record further shows that the swimming pool at this house was not a year-round pool since it was not enclosed, that the house had three bedrooms and not four, and that it was of a most unusual configuration, having two wings that almost made a triangle. None of these facts were considered by the witness in using the per square foot sales price of the house next door to the Robbins' house to determine the fair market value of the Robbins' house. In our view, this witness totally failed to make necessary adjustments to make the square-footage price of his so-called comparable house really comparable to a proper per square foot price for the *205 house petitioners purchased. Neither of the other two so-called comparables this witness used had swimming pools and both had garages. Since half of the square footage of the garage was included in determining the square footage of these houses, neither had substantially more square footage of living space than the house petitioner purchased. One of these houses sold in June 1977 for $74,000 and the other sold in June 1977 for $65,000; both were three-bedroom houses. The very fact that two houses in such close proximity to each other and of square footage very comparable, both with three bedrooms and a garage, sold at such diverse prices is proof itself that more than the mere selling price of a house and its square footage must be considered in determining a comparable to use to determine the fair market value of another property. If either of these houses is to be used as comparable to the house petitioners purchased, the value of the swimming pool would have to be added to the computed value of petitioners' house. The record is totally devoid of evidence of the fair market value of the pool apart from the house. In our view, the testimony of the witness offered by petitioners *206 is totally insufficient to show that the fair market value of the house purchased by petitioners in September 1977 was other than the price they paid for the house. Respondent offered the testimony of a witness who is employed by him s a valuation engineer. This witness considered a number of properties in the same general area of the house purchased by petitioners and came to the conclusion that the amount paid by petitioners for their house was approximately the fair market value to be arrived at on the basis of considering comparables. One of the houses considered by respondent's witness was located within a few blocks of petitioners' house and had sold earlier than petitioners purchased their house for $88,000. Although the record shows this house was somewhat superior to the house purchased by petitioners, the record also shows that during the period 1976 through 1977 houses were increasing in value. Considering the record as a whole, we conclude that petitioners have totally failed to establish that the negotiated price they paid for the house they bought of $77,000 was not the fair market value of the house at the time they purchased it. We have not overlooked the *207 testimony given by Dr. Robbins of some of the faults he found with the house at the time he purchased it. However, neither have we overlooked the fact that he had the house inspected by a person engaged in building repair work and that there is nothing in the record to indicate that this individual reported any major defects in the house to Dr. Robbins. The defects Dr. Robbins spoke of were such as to require what petitioners' witness referred to as "cosmetic" repairs which are generally necessary when a 20-year-old house is purchased. As we pointed out in footnote 1, supra, petitioners relied on the fact that they had believed when they purchased the house that the Moores were going to carry the mortgage on the house after a 2-year period of payment of interest only at an increased payment to be applied to principal as showing that they must have paid more than fair market value for the house. The record does not show how petitioners got this impression. Clearly the note itself does not so state nor do any of the other documents executed in connection with the purchase and sale of the house. If the lawyer who negotiated the sale for petitioners gave them this impression, *208 petitioners did not so state. In fact, the lawyer who negotiated the sale was not called as a witness. However, in our view, even if petitioners were under the impression that the house would be financed by the sellers over an extended period of time, this fact does not indicate that the price paid by petitioners was in excess of the fair market value of the house. Petitioners seemed to confuse their own claimed need for assistance in financing a house and their own financial situation with respect to purchasing a house with some form of compulsion to buy the particular house they bought. This record totally fails to support a contention that petitioners had any form of compulsion to buy this house. It may have been that petitioners were more willing purchasers because of the favorable financial arrangements they made for buying the house but this fact does not show that the amount they paid for the house was not its fair market value. On the basis of all the evidence of record in this case, we conclude that the amount paid by petitioners for the house they purchased in 1977 was not in excess of the fair market value of the house. Decision will be entered for the respondent. *209 Footnotes
1. Dr. Robbins testified that he had understood when the initial arrangements were made in 1977 that at the end of a 2-year period of payments of interest only, the Moores would again finance the property with an increase in the monthly payment so that some principal amount was then being paid monthly on the note. Respondent argues that, from the documents in the record, petitioners could not reasonably have come to that conclusion. In our view, it is immaterial whether or not there was a misunderstanding between the Moores and petitioners as to the refinancing of the house at the end of the 2-year period. In stating this fact, we are not unaware that petitioners place great reliance on this misunderstanding because of their view that the belief of the Robbins that the Moores would continue financing the house is an indication that the Robbins were not concerned with the price of the house as distinguished merely from being able to live there.↩
2. Sec. 1.213-1(e)(1)(iii), Income Tax Regs., provides in part as follows: a capital expenditure for permanent improvement or betterment of property which would not ordinarily be for the purpose of medical care (within the meaning of this paragraph) may, nevertheless, qualify as a medical expense to the extent that the expenditure exceeds the increase in the value of the related property, if the particular expenditure is related directly to medical care. Such a situation could arise, for example, where a taxpayer is advised by a physician to install an elevator in his residence so that the taxpayer's wife who is afflicted with heart disease will not be required to climb stairs. If the cost of installing the elevator is $1,000 and the increase in the value of the residence is determined to be only $700, the difference of $300, which is the amount in excess of the value enhancement, is deductible as a medical expense. If, however, by reason of this expenditure, it is determined that the value of the residence has not been increased, the entire cost of installing the elevator would qualify as a medical expense. * * *↩
3. For instance, Dr. Robbins testified that the monthly payments on the home they purchased were less expensive overall than their rental payments.↩
4. In the recent case of Lerew v. Commissioner,T.C. Memo. 1982-483, we were faced with a contention of respondent similar to the contention he has raised in the instant case with respect to the applicability of his regulations to the purchase of property as compared to an improvement made to property already owned by the taxpayer. In that case, in n. 2, we pointed out the history of the regulation with respect to deductions of part of the expenditures for capital improvements where such expenditures are made for a medically necessary item. In that case, we stated in n. 3 of the opinion: "We note that respondent also challenges whether any payment was made for medically-related expenses. However, quite clearly medical expenses can be incurred by purchases of assets as well as by their construction." In Lerew, supra,↩ it was held that the taxpayers therein could not show that they incurred any expenses in excess of the increase in value to the property since any amount they might have paid in order to acquire the pool would by definition represent the increase in value to the property caused by the presence of the pool. Respondent argues that this is true in the instant case, but in light of our holding we need not pass upon this contention.